RICHARD HAMMOND *v.* STATE OF MARYLAND
[No. 5, April Term, 1938.]

*Decided April 21st, 1938.*

The cause was argued before BOND, C. J., URNER, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*J. Howard Payne* and *Simon Silverberg,* with whom were *Silverberg & Silverberg* on the brief, for the appellant.

*Charles T. LeViness, 3rd, Assistant Attorney General,* with whom were *Herbert R. O'Conor, Attorney General,* and *Elmer J. Hammer, Assistant State's Attorney for Baltimore City,* on the brief, for the State.

URNER, J., delivered the opinion of the Court.

The appellant was indicted and tried in the Criminal Court of Baltimore City for the murder of Edith Milman on August 12th, 1937. The case was submitted for trial before the court without a jury. Three exceptions were reserved in the course of the trial, which resulted in a verdict of "guilty of murder in the first degree." After a motion by the defendant for a new trial had been overruled by the Supreme Bench of Baltimore City, he was sentenced by the criminal court to suffer death, and from the judgment imposing the sentence he has appealed.

One of the exceptions (the third) refers to a question which the court permitted to be asked the defendant on his cross-examination. As his answer was favorable to his defense, the ruling would not be ground for reversal even if we could regard it as erroneous. But we have no doubt as to its propriety.

The other two exceptions were taken because of the admission in evidence of two statements by the defendant, the first denying that he had any knowledge of the crime and the second, in effect, confessing his guilt. Before those statements were admitted the State had produced the following evidence:

It was testified by Colman Milman, husband of the woman who was the victim of the homicide, that, on the night it was committed, his wife retired about 11 o'clock in their apartment over his store at 400 North Fremont Street in Baltimore City; that about a quarter of twelve, while he was in the store, he heard his wife screaming, and when he went into the hallway adjacent to the store

he saw her standing on the second floor with her head bleeding, and she said, "Callie, a colored fellow hit me twice in the head"; that she was brought downstairs by the tenant of the third floor apartment; and that she died nine days later.

While the record on appeal does not appear to be complete, it justifies the conclusion that the death of Mrs. Milman resulted from the injury she received in the attack to which the testimony refers.

Delmar Gross, the third floor tenant, testified that on the night of the attack on Mrs. Milman he was in his apartment, and about a quarter of twelve he heard screams and ran downstairs to the second floor, where he found Mrs. Milman standing in the hallway and bleeding from her ear; that she said a colored man had hit her on the head while she was in bed, and had run downstairs.

It was proved by Officer Fogarty that a hole had been cut in a screen door at the rear of the house, and that a pair of shoes had been left at the foot of the stairs in the hallway.

The testimony in chief of William Taylor is thus summarized in the record: "That he was in the store on August 12th, and it was nearly twelve o'clock. That he heard screaming. That he looked toward the dining room. That he saw a fellow come downstairs and look into the store and go out through the dining room. That he had seen that fellow before, and knew him. That that fellow was Hammond (the defendant). That he knew him by the name of Pap. That the defendant went out the back, towards the kitchen. That he, Taylor, is in jail now as he was convicted of burglary, and that, while awaiting trial on this charge, the defendant called him and said to him, 'Why did you pick me out of the line-up' and that the witness said, 'You done it, didn't you', and the defendant said, 'I plead guilty—I confessed to it', and that the defendant also said to the witness, 'My brother-in-law came up there and identified my shoes.' "

Alfred Redwood testified, according to the record, in

part, as follows: "That he knows Hammond. That he lived with Hammond's sister and that Hammond lived with them. That he saw three pairs of shoes at the station house, and picked out one pair as Hammond's. That he knew the shoes, and had seen them for a couple of months. That Hammond was there at the time. That Hammond told the police in the witness' presence, that the shoes were his. That witness identified the same shoes in court, and stated they were Hammond's."

Dorothy Matthews testified: "That she went in Milman's place the night of the 12th of August, near twelve o'clock. That she heard some one scream. That she saw this man Hammond when he was going through the dining room. That she did not know him before that. That he went out the back door of the kitchen. That she ran to the front door and saw him peep out of the alley. That she noticed he didn't have on any shoes. That she saw the same man at the Western Police Station in the line-up of six men. That she identified Hammond in the court room. That she later saw the shoes in the hallway by the stairs, before the police picked them up. That she identified the shoes in the court room. That they were on the first floor. That when the man came down the stairs, she saw his face because he looked toward the store."

Lieutenant Rollman was then called as a witness, and we quote as follows from the record of his testimony: "That after the arrest, he asked Hammond if he wanted to make a statement and told him of his rights, anything he may say may be used against him as evidence in court. That he told him he did not have to make a statement if he didn't want to. That he made a statement, which was reduced to writing. That in the morning, after the shoes had been identified in the presence of Hammond, by Redwood, Hammond stated they were his shoes, and he said he would tell the truth about the matter. Q. He had already made one statement, had he not? A. He had. * * * Q. Did he sign that first statement? A. He did. Q. Were any promises, or inducements made to him? A. No promises, threats or duress at all was had."

On cross-examination the witness said that the statement about to be introduced had been read by and to the defendant and signed by him, and it was then admitted in evidence over the defendant's objection. It is herewith quoted in full: "Statement of Richard Hammond, colored, Alias Pap, Age, 31, 10 West York Street, taken at the Western Police Station 10:30 a. m. on August 22nd, 1937. I do not know where I was on August 11th, I cannot say. I do not know where Mulberry Street and Fremont Avenue is. I know where Baltimore Street and Fremont Avenue is, but do not know the streets north of Baltimore Street. I know the man who picked me out, that is, I know him to see him on the street but do not know his name. At the Western Police Station, I saw these three people pick me as the man. I do not know anything about it. I was shown the candlestick but I do not know anything about that. I was asked whose shoes I have on and I said I have my brother's shoes on. My brother's name is William Hammond, 820 Sharp Street. I was shown a pair of shoes in the office at the Western Police Station and I tried them on and these shoes fit me but I never saw them before and do not know who they belong to."

After the admission of that statement, to which the first exception was taken, the testimony of Lieutenant Rollman, thus, in part, proceeded: "That after the identification of the shoes his second statement was then made. That when Redwood was at the station house, four pairs of shoes were lined up on the window sill. That they were shown in the presence of Hammond and Redwood said they are Pappy's, Richard Hammond's shoes, and Hammond then and there said the shoes are my shoes. That the defendant was again told that no threats were being made or any promises offered to him; he was asked if he wanted to make a statement and he said, he did. That the statement was taken, put into writing, later typewritten, and read to him and signed by him in the presence of Sergeant Forrest, Officer Maskell and myself."

An objection by the defendant to the admission of the

second statement having been overruled, it was read in evidence, as follows: "Statement of Richard Hammond, colored, Alias Pap, taken at the Western Police Station on August 22, 1937. After being informed of my rights and being told that anything I say may be used for or against me later, I make this statement of my own free will, without any threats being made against me or any promises made to me. I was drinking a little that night and I was up town and I got in a window and I saw a woman in bed and she screamed and I ran down the steps and out the back and jumped over the fence. It might have been Mulberry and Fremont Street, but I do not remember if it was. I lost my shoes at the time and I went straight home to 10 West York Street and my sister Madeline let me in the house and I remember waking up the next morning and could not find my shoes. The pair shoes the Lieutenant is now showing me are my shoes and they are the shoes I had on that night. When the woman screamed, I got scared and I do not remember hitting her. The things I told you before are wrong and I am now telling you what is the truth."

The defendant was called by his counsel and questioned as to the two statements after they had been introduced. This was permitted by the trial judge, although, as he suggested, the defendant's testimony as to the circumstances under which he made the statements should have been offered before the ruling as to their admissibility. From his testimony at that stage of the trial we quote as follows: "Q. If you signed this second statement, saying the first statement was untrue, why did you do that? A. Why did I sign the first statement? Q. No, the second statement? A. At the time I signed the first statement, I was kinda scared and I was nervous and everything, like I am now. * * * Q. Then, when the second writing there was given to you and you signed it, why did you do so? A. Why did I do so? Q. Yes. A. Because I was scared. Q. Scared of what? A. Well, the first time, you see, I have had any trouble like this. Q. Didn't you know in your second statement, that one or the other of them was

true? A. Yes, sir. Q. Well, which was true? A. The first one. Q. Then did you sign the second statement voluntarily? A. Yes, sir, I did. Q. Did the officer tell you that you should sign the second statement? A. No, they didn't tell me I should do it. Q. Well, why were you scared? A. I don't know what I was scared, but I was. * * * Q. They read a statement to you and you signed that, denying everything? A. Yes, sir. Q. And that same afternoon some police brought you back in there. A. Yes, sir. Q. And they asked these questions? A. Yes. * * * Q. How did they treat you in there? A. Well, they treated me all right. Q. Then they went along with you and finally they read this statement over to you? A. Yes, sir. Q. You know one or the other is true. Why did you sign the last statement? A. Because I was scared and nervous and everything and I generally know what happens to fellows, you know, that commit murder."

The trial judge found in the defendant's testimony no reason to conclude that the confession in the second statement was other than free and voluntary, and therefore adhered to the previous ruling to that effect. The renewed objection to the admission of the statement was accordingly overruled, and the second exception was thereupon reserved.

The State having then closed its case, the court called as a witness Dr. Guttmacher, medical officer of the Supreme Bench. It is argued on behalf of the defendant that his mentality, as described by Dr. Guttmacher, is such as to reflect unfavorably upon the defendant's appreciation of the confession which he signed. Dr. Guttmacher said: "I made an examination of this man on September 28th, at the jail. There is, so far as I can determine, no evidence he is suffering from any type of mental disorder. * * * The patient, at the time I saw him, was under a good deal of tension, was what might be termed as nervous, his intelligence level is not high, but I don't think that one would feel that he was a strikingly defective man; he might be classed as a high grade moron or perhaps a low average member of his social group. * * *

I felt he was quite alert, had a good memory and in my opinion seemed to know right well the difference between right and wrong and realized the nature and consequences of his act. * * * We gave him the standard intelligence test which we use. That is not a measuring instrument like blood pressure apparatus. It gives us a certain index as to the individual's mental make-up. His level is slightly lower than the average male negro defendant who comes into our court, but the difference is relatively slight. I should say, as my memory serves me, he is somewhere around five per cent lower in his performance than the average male negro who comes into our courts and I don't feel that the tests we use can be too strictly applied to individuals who haven't had the benefit of a high school education and who haven't had a better social environment that his has been. I think he makes a lower score than his native intelligence would indicate, and even taking that, as I say, he is not much lower than the average who comes into this court."

In that testimony there is no adequate basis for a doubt that the defendant was mentally capable of making a voluntary confession and of appreciating the nature and consequences of the crime of which he has been convicted. Further support for such a conclusion is afforded by his own testimony, when he was first questioned as to his two statements and when he was later called as the only witness for the defense.

In order to be entitled to have admitted as evidence the defendant's self-incriminatory statement, it was incumbent upon the State to prove that it was made freely and voluntarily and was not obtained by any improper inducements. *Nicholson v. State,* 38 Md. 140; *Biscoe v. State,* 67 Md. 6, 8 A. 571; *Ross v. State,* 67 Md. 286, 10 A. 218; *Rogers v. State,* 89 Md. 424, 43 A. 922; *Watts v. State,* 99 Md. 30, 57 A. 542; *Toomer v. State,* 112 Md. 285, 292, 76 A. 118; *Birkenfeld v. State,* 104 Md. 253, 65 A. 1; *McCleary v. State,* 122 Md. 394, 89 A. 1100; *Deems v. State,* 127 Md. 624, 96 A. 878; *Cothron v. State,* 138 Md. 101, 113 A. 620; *Rasin v. State,* 153 Md. 431, 441, 138

A. 338; *Markley v. State,* 173 Md. 309, 196 A. 95. The evidence in this case proves without contradiction that the confession of the defendant was not procured by any threats or promises, and that, according to his own testimony, he made the statement voluntarily to the officers who questioned him, and that they treated him fairly.

Reference was made in the argument for the defendant to the recital in his confession of a warning that anything he would say might be "used for or against" him, and certain Texas and early English cases were cited in connection with the suggestion that, because of the defendant's nervous condition and limited intelligence, the use of the word "for" in addition to "against" in the phrase quoted from the caution given him might have induced him to hope for some resulting favor. The Texas cases were governed by a statute specifying the form of warning to be given before a confession is received, and it is frankly stated in the appellant's brief that, according to the later English rule, the use of the words "for and against" in such a caution to the accused does not render his confession inadmissible. *Rex. v. Baldry,* 5 Cox, Cr. Cas. 523. The confession in the present case not only recites the warning in the form quoted, and admits the absence of any threats or promises, but also states that the defendant made the statement of his "own free will." Upon the evidence in the record we could not justly hold that the rulings as to the admissibility of the confession and the prior statement were erroneous.

*Judgment affirmed.*