GREEN *v.* STATE

[No. 13, September Term, 1964.]

336

■■■■■■■■■■■■■■■■■■■■■■

*Decided October 20, 1964.*

■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■

The cause was argued before HENDERSON, C. J., and HAMMOND, PRESCOTT, HORNEY, MARBURY and SYBERT, JJ.

*John R. Hargrove,* with whom were *Howard & Hargrove* on the brief, for appellant.

*Robert L. Karwacki, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, William J. O'Donnell,* and *Charles E. Moylan, Jr., State's Attorney* and *Deputy State's Attorney,* respectively, *for Baltimore City,* on the brief, for appellee.

SYBERT, J., delivered the opinion of the Court.

Clarence H. Green, tried under two indictments in the Criminal Court of Baltimore before Judges Oppenheimer and Harlan without a jury, was found guilty of the first degree murder of James Duffy and the rape of his wife, Naomi Ann Duffy, and received two consecutive sentences of life imprisonment, the judges stating that they desired thus to prevent an early application for parole. In this appeal he contends that two signed statements and a diagram of the scene of the crimes, which he gave to the police while under arrest for other unconnected crimes, were improperly admitted in evidence and that therefore his convictions should be reversed.

The details of the crimes need be summarized only briefly because the questions on appeal must be determined from the events which occurred after Green's arrest. According to the evidence submitted by the State, Mr. and Mrs. Duffy, with their children, were living temporarily on the first and second floors of a house at 1732 North Calvert Street in Baltimore. In the darkness of the early morning of August 24, 1963, Mrs. Duffy

was awakened by a scuffle on the mattress upon which she and her husband had been sleeping on the first floor. Assuming that one of the two struggling figures was her husband, she attempted to go to the front door to get help but was grabbed by the intruder, who cut her face from nose to ear with a razor and then continued his struggle with Mr. Duffy, in the course of which he cut Mr. Duffy's throat with a razor, causing his death. Mrs. Duffy went into the next room and switched on the light, at which time she observed Green, who turned off the light, dragged her onto the mattress and raped her, then asked the way out of the rear of the house and fled.

Some seven weeks later, on Sunday, October 13, 1963, at about 3:40 A.M., Green, then seventeen years of age, was arrested under a warrant charging him with assault and robbery (unrelated to the crimes involved here), and was taken to the Northeastern district police station. Green's mother was notified shortly thereafter, but neither she nor any other member of the family came to the station house that day or the next. On the day of his arrest he was interrogated for one and one-half hours, beginning at 9 A.M., concerning the crimes for which he had been arrested, and he confessed to the commission of those crimes and was then returned to his cell.

On the next day, Monday, Green was questioned from forty-five minutes to an hour, beginning at 9 A.M., as to other crimes which had remained unsolved, and was returned to his cell. At 1:35 P.M. on the same day, for the first time, he was interrogated for twenty-five minutes in regard to the Duffy rape-murder case and was returned to his cell. At 2:30 P.M. he was again questioned for fifty-eight minutes about the Duffy case and returned to his cell. At about 9:47 P.M., he asked to use the telephone and was permitted to do so.

Green consented to a polygraph examination on Tuesday, October 15, 1963, concerning the Duffy case. It was conducted at Northeastern and extended from 9 A.M. to 12:45 P.M. The prisoner was then interrogated about the Duffy case until 2 P.M., had lunch, and was questioned further from about 2:30 until 3:05 P.M. He then asked to be returned to his cell to meditate, which request was granted, and he remained alone in his cell for fifteen minutes. Interrogation was resumed about

3:30 P.M. and at approximately 4:45 P.M. Green admitted orally that he was involved in the Duffy case. He then drew a diagram of the scene of the crimes. His admissions were transcribed from 5:40 to 6:25 P.M., and then signed by him. After his evening meal he agreed to re-enact the events of August 24 at 1732 North Calvert Street and did so at 8:30 P.M. and then was returned to his cell at Northeastern. At about 9:20 P.M. he asked and was granted permission to use the telephone. He then said he desired to speak with his mother. A police car brought her to the station house and mother and son conferred. On the next day, Wednesday, at about 2:40 P.M., Green made and signed a second statement closely similar to the one given on the previous day.

The appellant did not testify at the trial. There was no contradiction of the positive testimony of the interrogating officers that from the time of his arrest he was treated properly, fed regularly, permitted to use the telephone when he desired, and that at no time were any force, threats or inducements used to obtain any incriminating admissions from him. No claim is made that he requested counsel, or that he asked to see relatives or friends until after he made the first statement.

In the two statements the appellant admitted that he inflicted the fatal wound upon Mr. Duffy and then had sexual intercourse with Mrs. Duffy. However, he justified his infliction of the mortal wound by stating that he was attacked by the husband with the razor, that he disarmed the husband, and that he delivered the lethal slash while defending himself from further attack. As to the rape charge, he exculpated himself from criminality by averring that Mrs. Duffy enticed him into the house with an offer of sexual relations and that he entered in the belief that she was alone.

While the statements appear to be more exculpatory than otherwise, they were incriminatory in certain respects. They conceded the appellant's presence in the house, his slashing of the husband and his intercourse with the wife. They stated that the fatal blow was struck after the husband had lost his balance in the scuffle and fallen on the mattress; they indicated that at that point the wife was scared and did not wish to have intercourse; they showed that the appellant had "studied to be a

barber", indicating familiarity with razors. Thus, because of the incriminatory aspects, the statements must have been made voluntarily to have been admissible. *Stewart v. State,* 232 Md. 318, 193 A. 2d 40 (1963).

While conceding that the police used no physical force, intimidation or inducements in obtaining the statements and the diagram (which we shall hereinafter refer to as "the statements"), the appellant contends that they were not made voluntarily because the "totality of all the circumstances shows very definitely that pressures of various types were brought upon the appellant [so] that his will was overborne" when they were obtained.

We agree with the appellant that the voluntariness of the statements controls their admissibility. As this Court found in *Mefford and Blackburn v. State,* 235 Md. 497, 201 A. 2d 824 (1964), the Supreme Court decision in *Escobedo v. Illinois,* 378 U. S. 478 (1964), does not destroy the voluntariness test. The question of whether *Escobedo* has any effect on the case before us will be discussed later.

The first circumstances upon which the appellant relies to support his contention that the statements were not voluntary is the "characteristics" of the appellant, or more specifically, as appellant's brief sets forth: his "age, intelligence, education, race experience and suggestibility and liability of intimidation". As to age, the appellant was seventeen years old at the time he gave the statements to the police. As we said in *Bean v. State,* 234 Md. 432, 441, 199 A. 2d 773 (1964), a case involving a fifteen year old Negro youth accused of rape, age alone will not render an otherwise voluntary statement involuntary. As to intelligence and education, the appellant had completed the tenth grade in the Baltimore public schools, and there is no intimation in the record that his mental capacity was other than normal. In *Hammond v. State,* 174 Md. 347, 198 Atl. 704 (1938), this Court upheld the admissibility of the confession of one who, according to testimony by psychiatrists, "might be classed as a high grade moron or perhaps a low average member of his social group." See also *Bean v. State, supra; Taylor v. State,* 187 Md. 306, 49 A. 2d 787 (1946).

The next characteristic mentioned is "race experience", Green

being a Negro. So far as we can determine from the record, the matter of the appellant's race had no significance in his treatment and questioning by the police. Certainly, the matter of race was no more significant in the instant case than in *Bean, supra*. Finally, there is nothing in this record to indicate that the appellant's admissions were the result of suggestion or intimidation, or that either was offered. He was no stranger to the procedures of the police department since, prior to the events in this case, he was convicted on one occasion of breaking and entering two warehouses, on another occasion of disorderly conduct, and as a juvenile he had been committed to Boys' Village, from which he escaped, and was subsequently arrested as a fugitive and returned. Considering all of the mentioned "characteristics" of the appellant, we find no evidence which requires a holding that the otherwise voluntary statements were the result of an overborne will.

The appellant next contends that failure to hold a preliminary hearing on the charges for which he was initially arrested, even though he promptly admitted guilt on those charges, "makes one suspicious as to the purpose of the initial arrest". There is no contention that the initial arrest, under warrant, was illegal and that question is not before us. The answer is found in the recent case of *Mefford and Blackburn, supra,* where we stated (at p. 512 of 235 Md.) : "The failure to have preliminary hearings is not of material significance on the matter of the voluntariness of the confessions."

The next factor which appellant mentions is the length of time of questioning. The facts here are analogous to our findings in *Mefford and Blackburn (ibid.)* : "There was no unduly long questioning, no persistent hammering by relays of officers, no physical mistreatment, no deprivation of rest or food * * *." In the case before us the appellant was not at any time questioned for any unreasonably long period; he was given adequate food and rest; and although he was interrogated on three consecutive days, there is no showing that his will was ever overpowered. See *Jones v. State,* 229 Md. 165, 170, 182 A. 2d 784 (1962).

The appellant states next that "perhaps the most important factor to be considered in this case is the complete failure of

anyone to advise the appellant of his right to remain silent and that he had a right to counsel", relying primarily on *Escobedo v. Illinois, supra.* We concluded in *Mefford and Blackburn* that the holding in *Escobedo* is limited to the facts and circumstances before the Supreme Court in that case. As was true in *Mefford,* there are a number of factors which distinguish the case before us from *Escobedo.* In the latter, the defendant had previously retained counsel; here, Green had not. There the defendant asked to see counsel and was denied; here there is no contention that Green ever requested counsel. Escobedo had had no previous experience with the police; Green had had several encounters with law officers and courts. In *Escobedo* there was a claim that the police promised the release of the defendant if he confessed; here there is no contention that the police made Green any promises. Escobedo was held incommunicado until he confessed; Green was permitted to use the telephone at will. (We think it significant that Green used the telephone before he made the first statement and diagram and then, in effect, reiterated the statement after talking with his mother.) Finally, in *Escobedo,* the defendant was not apprised of his right to remain silent; here, in the first statement there is the following question and answer: "Q. Now, Clarence, before you say anything, we must advise you that what you say must be free and voluntary on your part. There will be no promises, no one will threaten you in any manner, and what you say can and may be used against you in a court of law. Do you understand what I have just said? A. Yes, sir." He was then asked whether he was "still willing" to tell about the occurrence, and he replied in the affirmative. The second statement contains almost identical language. We will assume, without deciding, that the above language amounts to an apprisal of the appellant's right to remain silent; but even if it did not amount to such, we hold that the failure to so advise the appellant, alone, is not sufficient to make an otherwise voluntary statement involuntary. This is in conformity with our previous decisions, see *Hyde v. State,* 228 Md. 209, 225, 179 A. 2d 421 (1962), and cases cited. (Though the facts in that case were again before this Court in *Hyde v. Warden,* 235 Md. 641, 202 A. 2d 382 (1964), we find nothing therein to disturb the statement in the original case relating to the failure to inform of the right to remain

silent.) Therefore even if we assume, without deciding, that *Escobedo* is retrospective in application, it is distinguishable on its facts. See *Mefford and Blackburn v. State, supra,* and *Parker v. Warden,* 236 Md. 236, 203 A. 2d 418 (1964). In *Haynes v. Washington,* 373 U. S. 503 (1963), cited by the appellant, the accused asked permission to call counsel and was refused, and thus the case is distinguishable.

The appellant finally contends that he was separated from his family while undergoing interrogation and that this might have affected the voluntariness of his statements. The answer is that there is no shred of evidence in the record that the police prevented contact between the appellant and members of his family. His mother was notified of his arrest shortly after it took place on Sunday morning but did not visit him until she was brought in by the police on Tuesday evening at the son's request. Appellant used the telephone twice and could have phoned his family (and possibly did). We find no merit in this contention. Cf. *Bean v. State, supra.*

Considering all the circumstances surrounding the giving of the statements and the diagram, we hold that the lower court was not in error in finding that the statements were voluntarily made, and not coerced.

*Judgments affirmed.*