**William F. DAVIS**

v.

**MARYLAND HOUSE OF CORRECTION.**

**Civ. A. No. 16084.**

United States District Court
D. Maryland.

Nov. 4, 1965.

Howard J. Krongard, Baltimore, Md., for petitioner.

Thomas B. Finan, Atty. Gen. of Maryland, and Robert F. Sweeney, Asst. Atty. Gen., Baltimore, Md., for respondent.

NORTHROP, District Judge.

William Franklin Davis was convicted in May of 1964 of arson and attempted murder by Judge Grady, sitting without a jury, in the Criminal Court of Baltimore City. Concurrent sentences of five years and two years, respectively, were imposed. The conviction was not appealed nor was the subsequent denial of post-conviction relief. Nevertheless, for reasons to be discussed, a full evidentiary hearing was believed necessary.

Because this case did not reach the Court of Appeals, no transcript of either court proceedings was prepared. Consequently, in making definitive findings on the factual issues presented, I must rely on the testimony presented and the exhibits introduced at the hearing.

It appears that on the evening of February 16, 1964, petitioner, along with his brother and sister, paid a visit to Davis' former residence, 711 McHenry Street in Baltimore, which was then serving as the residence of Davis' wife and her boy-

friend. Davis and his wife had been separated for a short time, and he had hoped, by this visit, to effect a reconciliation. However, shortly after his arrival, it became apparent that his own impulsiveness and irascibility would defeat his purpose, for he soon challenged the paramour to a fight, and, in return, was threatened with a gun. Petitioner's brother intervened, preventing further disturbance, but before Davis departed, he exclaimed that he was going to "burn up" his wife and the paramour.

Later that evening, a fire occurred at the McHenry Street house. At approximately three o'clock the following morning, petitioner was picked up while returning to his sister's house, where he was then residing. The arresting officers had been searching for him there and encountered him as they were departing. Davis claims to have gone drinking as soon as he left McHenry Street, and then, just prior to his return, had been at a hospital seeking treatment for a chronic headache.

Davis was arrested without a warrant upon information received from his wife and her paramour. A warrant of arrest was properly issued later, while Davis was in jail.

According to Davis, at approximately four o'clock questioning began under the direction of a Captain Powell. Petitioner states that he was constantly questioned by Powell until seven o'clock that morning, when he was removed to his cell. Just as he was about to fall asleep, around eight or nine o'clock, he was supposedly awakened and taken to an interrogation room for further questioning. Davis claims that Powell again conducted the interrogation. At twelve o'clock noon, Davis began to confess to having set fire to 711 McHenry Street.

At the hearing, Davis testified that he was coerced into making the confession, that he did not request nor was he informed of his right to an attorney, and that he was not informed of his right to remain silent. Furthermore, no one advised him that he could communicate with his family or with whomever he desired.

Nevertheless, with respect to his treatment while in custody, he admitted that there was no physical force exerted, but he added that he feared it, because on a previous occasion, following his arrest and incarceration on a charge of assault, a cell neighbor had returned from an interrogation session complaining of brutality. Davis said he had also been informed of other instances of mistreatment.

In addition, Davis claims to have been frightened by two incidents: one in which Captain Powell kicked his chair, and the other shortly thereafter when Powell allegedly said, "You can save us a lot of time and trouble if you tell us what we want—you know what I mean, you're a smart fellow, you went to the tenth grade." Davis interpreted this statement—particularly, "you know what I mean," to indicate that dire consequences would result if he refused to confess. Again, there were no direct or actual threats nor any type of physical or mental mistreatment.

Detective Sergeant William Rawlings, who was present during the interrogation, testified at the hearing. He states that Captain Powell did not begin to question Davis until eleven-twenty-two that morning, which was the time that he and Powell arrived at the police station. For two hours prior to that time, Powell had been waiting for Rawlings to finish with another investigation. Rawlings does not deny that Davis was questioned between four and seven o'clock, but is of the opinion that it was brief and uneventful. Rawlings said that Powell was not present at the earlier questioning. In addition, it was established that Captain Powell is not a police officer but rather a member of the fire department.

According to Sergeant Rawlings, the second questioning session lasted thirty-eight minutes, from eleven twenty-two until noon, which was when Davis began to confess. He and Captain Powell were present throughout this session, including the time during which the confession was given. His testimony revealed also that the statement was rendered

without reluctance, that no one kicked Davis' chair, that Davis was offered food which he did not eat, and that there was a period of more than two hours in which Davis was left alone in his cell.

■ After the confession, a preliminary hearing was conducted. Davis was not represented by counsel. He claims that he pleaded guilty there, but this statement contradicts Sergeant Rawlings' testimony that no plea was taken from Davis and that petitioner was advised not to say anything. I accept the Sergeant's testimony on this point and hold, in accordance with DeToro v. Pepersack,[1] that a preliminary hearing is not considered a critical stage when the accused enters a plea of not guilty, or when no plea is entered, and that, therefore, lack of representation at those proceedings is not violative of the Sixth Amendment.

■ Notwithstanding this finding and assuming petitioner did plead guilty at the preliminary hearing, I adopt on this point the decision of Judge Cullen, who presided at the post-conviction hearing: "It was not alleged and the evidence does not show that the State at any time referred to the plea before the magistrate."[2] Thus, Davis would not have been prejudiced by his plea and by the lack of representation.

■ The issue of exhaustion of state remedies was debated at the hearing, but was not pressed by the State. Although testimony did reveal certain facts indicating a failure to exhaust and a deliberate bypass of state remedies, I do not feel that the interests of comity and justice will be served by returning this case to the state courts. The Maryland Court of Appeals, in other cases, has decided adversely to petitioner's present position on two issues involved herein, the necessity of requesting counsel at an interrogation stage[3] and of being advised of a right to remain silent.[4] Consequently, no useful purpose would be served by returning the case to the state court.[5] Davis would simply re-petition this court to have it make the same determination that it could just as easily and properly make now. Other issues present factual questions which already have been decided at the post-conviction hearing. No new facts are now alleged which would support the State's reaching a different conclusion upon remand.

■ The first factual issue to be discussed involves the validity of the Davis arrest. According to Maryland law, the absence of a warrant can be justified only by the presence of "reasonable grounds to believe at the time of the arrest that a felony had been committed and that the person arrested had committed the offense."[6] And, as the Fourth Circuit has stated, "the law of the place of the arrest determines its validity."[7] Reasonable grounds certainly existed here in that Davis' wife and her paramour informed the police of petitioner's threat.

With respect to the second issue, voluntariness vel non of the confession, Sergeant Rawlings' account of the interrogation is again more believable than the conflicting testimony. It does not appear that petitioner was unduly burdened, if burdened at all, by the questioning nor had he reasonable basis to fear bodily harm. The chair-kicking incident related

1. 332 F.2d 341 (4 Cir. 1964), cert. denied 379 U.S. 909, 85 S.Ct. 198, 13 L.Ed.2d 181 (1964), affirming 222 F.Supp. 621 (D.Md.1963).

2. State ex rel. Davis v. Warden, P.C.No. 830, Criminal Court of Baltimore City, April 26, 1965.

3. See Green v. State, 236 Md. 334, 203 A.2d 870 (1964); Parker v. Warden, 236 Md. 236, 203 A.2d 418 (1964); Sturgis v. State, 235 Md. 343, 201 A.2d 681 (1964).

4. See Bull v. State, 239 Md. 101, 210 A.2d 396 (1965); Jenkins v. State, 238 Md. 451, 209 A.2d 616 (1965); Dyson v. State, 238 Md. 398, 209 A.2d 609 (1965).

5. Hayes v. Boslow, 336 F.2d 31 (4 Cir. 1964); Evans v. Cunningham, 335 F.2d 491 (4 Cir. 1964).

6. Mulcahy et al. v. State, 221 Md. 413, 421, 158 A.2d 80, 85 (1960).

7. Ralph v. Pepersack, 335 F.2d 128, 135 (4 Cir. 1964).

by Davis, allegedly occurring when Sergeant Rawlings had left the room, is in direct conflict with the Sergeant's testimony that he was present during the entire interrogation, and is not believable. The testimony concerning his knowledge of other brutality does not, in this particular instance, present grounds to support a finding of coercion.

The Supreme Court has posited tests to be applied in determining the extent of coercion necessary for a finding of involuntariness. Such tests take into consideration individual differences in intelligence and experience. For example, one test is "whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined * * *." [8] An alternative standard was stated in an earlier case:

"The limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing. What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal." [9]

Davis has several previous convictions and does not appear naive in the ways of criminal justice and police procedure. He has a tenth grade education and during the course of the hearing manifested a fairly good vocabulary as well as a coherent explanation of events. He expressed confidence in his own mental prowess to the extent that he professed to have memorized his five-page confession. I, therefore, find the evidence to indicate a freely and voluntarily-given confession.

I think that this finding relative to his intelligence and experience may be applied to refute Davis' third argument: he was not advised of his absolute right to remain silent. There is little doubt in my mind that the questions asked in this confession would, to a reasonably intelligent person, constitute such advice. The pertinent portion of the confession reads as follows:

"Q. William, I'd like to talk with you about an alarm of fire * * * and ask you if you are willing to tell us what you know about this fire?

"A. Yes.

"Q. Before you say anything, I want to advise you that what you say must be free and voluntary on your part, given by you to us without any threats or promises of any kind having been made to you, and that what you say can and will be used for or against you in a court of law. Do you understand what I have just said?

"A. Yes.

"Q. Understanding this, are you still willing to tell us what you know about this fire at 711 McHenry Street?

"A. Yes, I am."

Of course, it is apparent that Davis was not told directly that he could remain silent, if he so desired, but he was told that whatever was said would have to be voluntary. Thus, if he wished to remain silent, he could have; that is, he should have understood that if there was nothing that he could say in a free and voluntary manner, he need not say anything.

There is authority on the point that advice, such as the above, does not afford sufficient notice of the right to remain silent. However, in that case, United States ex rel. Rivers v. Myers,[10] petitioner (actually the relator) was uneducated, mentally defective, and mental-

---

8. Rogers v. Richmond, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961).

9. Stein v. New York, 346 U.S. 156, 185, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522 (1953).

10. 240 F.Supp. 39 (E.D.Pa.1965).

ly ill. To a man of Davis' intelligence, such language should not have this effect. In any event, I am not willing to accept categorically the proposition that advice such as that given in the Davis and Rivers confessions is not sufficient to inform a prisoner of a right to remain silent.

The next question presented in this petition concerns the right to counsel at the interrogation stage. According to the majority of federal and state decisions, including the Fourth Circuit decision in Davis v. State of North Carolina,[11] the now-familiar case of Escobedo v. State of Illinois [12] holds, on this point, that at a pre-indictment stage, one must request counsel in order to be entitled to counsel.

█ Several well-reasoned cases support the contrary view.[13] However, in holding in accordance with the majority of courts, I rely first on the express wording of Escobedo:

"We hold * * * that where * * * the suspect has requested and been denied an opportunity to consult with his lawyer, * * * the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment * * *." [14]

Of course, it is possible that the Supreme Court did not intend its holding to be limited in this manner. Lower court judges can only speculate as to the intent of their superiors, but I, like many of my brothers, believe there is sound reasoning for holding that a request is required and that Escobedo was intended to be so limited.

It is true, as counsel has argued, that Escobedo, to some extent, is an extension of the right-to-counsel doctrine enunciated in Gideon, but true also, and of more significance is the fact that Escobedo is aimed at combating third-degree methods and other forms of mistreatment that may exist during the interrogation stage. In combating this activity, the courts have established certain guidelines to be applied in determining whether the atmosphere in which the interrogation was conducted was conducive to freely and voluntarily-given statements. Added to the previous list of determinants that includes such factors as hours of sleep, time allowed between questioning periods, quantities of food, and the presence of relays of questioners is now the denial of a request to speak with an attorney. In fact, the denial of any reasonable request leaves the impression that the interrogation session was not conducted properly. Thus, one purpose of Escobedo may have been to establish the denial of the request for counsel as being an additional factor that must be considered in the totality of circumstances surrounding the confession.

Secondly, interrogation sessions often lead police to conclude that there is no probable cause to arrest a suspect. The compulsory attendance of an attorney will often result in an instruction to remain silent even when the suspect feels that he has exculpatory comments to offer. The silence of the suspect allows no choice to the police but to arrest him, thus causing possible permanent damage to the otherwise clear record of an innocent bystander. The public also suffers here when an innocent suspect, under instruction to remain silent, does not disclose information that could lead police officers to the two offender.

11. 339 F.2d 770 (4 Cir. 1964).

12. 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed. 2d 977 (1964).

13. E.g. United States ex rel. Russo v. State of New Jersey, 351 F.2d 429 (3 Cir. 1965) and People v. Dorado, Cal., 42 Cal.Rptr. 169, 398 P.2d 361, 381 U.S. 946, 85 S.Ct. 1793, 14 L.Ed.2d 710 (1965).

14. 378 U.S. at 490–491, 84 S.Ct. at 1765.

The holding that Escobedo is to be limited strictly to its facts makes unnecessary any discussion as to its retroactivity. However, it. is interesting to note that since the Supreme Court's decision in Linkletter v. Walker,[15] the cases have been unamimous in declaring Escobedo not to be retroactive. The leading federal cases so holding are United States ex. rel. Walden v. Pate [16] and Carrizosa v. Wilson [17], as well as United States ex. rel. Conroy v. Pate,[18] which preceded Linkletter. In a pre-Linkletter state case, In re Lopez,[19] the California Supreme Court, Judge Tobriner writing for the majority, held that Escobedo was not retroactive. The interesting point here is that, in the Dorado [20] case, that same court with the same judge writing extended Escobedo to hold that a request is not necessary to invoke the Escobedo doctrine. Judge Zirpoli, in Carrizosa [21], creates the same distinction. Thus, even those courts which interpret Escobedo less restrictively than this court does, are still not willing to accept its retroactivity.

The conscientious efforts of Howard J. Krongard, Esquire, appointed by the court in this case, are appreciated.

For the foregoing reasons, it is fourth day of November, 1965, ordered:

1. That Davis' petition for a writ of habeas corpus be, and the same hereby is, denied;

2. That leave to file said petition in forma pauperis is granted; and

3. That the Clerk mail a copy of this Order to the petitioner, to his court-appointed counsel, and to the Attorney General of Maryland.

---

15. 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed. 2d 601 (1965).

16. 350 F.2d 240 (7 Cir. 1965).

17. 244 F.Supp. 120 (N.D.Cal.1965).

18. 240 F.Supp. 237 (N.D.Ill.1965).

---

19. 42 Cal.Rptr. 188, 398 P.2d 380 (1965). Also, Lopez was decided on the same day as was Dorado.

20. See infra note 13.

21. 244 F.Supp. 120 (N.D.Cal.1965).