# MILLER *v.* STATE OF MARYLAND

[No. 385, September Term, 1967.]

364

*Decided November 12, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, BARNES, FINAN, SINGLEY and SMITH, JJ.

*John C. Sullivan* for appellant.

*Alfred J. O'Ferrall, Assistant Attorney General,* with whom
were *Francis B. Burch, Attorney General, Thomas N. Biddi-
son, Jr., Asst. Attorney General,* and *Donald W. Mason, State's
Attorney for Allegany County,* on the brief, for appellee.

MARBURY, J., delivered the opinion of the Court. BARNES,
J., concurred in the result and filed a concurring opinion. See
p. 383 *infra.*

On October 30, 1967, the appellant, Gary Lee Miller, was
convicted of murder in the first degree in the Circuit Court for
Allegany County, Judges Naughton and Getty presiding with-
out a jury. On November 16, 1967, he was sentenced by the
court to suffer death by the administration of a lethal gas. From
that sentence he has appealed. Two questions are raised on ap-
peal: I, was the alleged oral confession in this case given vol-
untarily and was the lower court in error in allowing a State's
witness to read the typed unsigned statement into evidence;
and II, was the evidence sufficient to convict the appellant of
the crime of murder.

There was evidence adduced in the lower court as follows:
On Saturday night, May 27, 1967, the victim, Judy Lee Ziegler,
aged twenty, went in her automobile, a yellow Corvair, with
three girl friends to see a movie in Frostburg, Maryland. She
took her other companions home, leaving the last two at their
homes in Finzel, Maryland, about three miles from the Mary-
land-Pennsylvania line, at approximately 11:55 p.m. The next

time she was seen was the following morning around 9:30 a.m. when Mrs. Annie Robinson and Mrs. Mary Lou Thorp discovered her battered body near Mrs. Robinson's house.

The scene of the crime was located near an area known as Butternut Hollow, which lies in an easterly direction off the Hoffman Road in Allegany County. The victim's body was found about 140 feet east of the Hoffman Road on a steep embankment surrounded by trees, brush and large stones. A Japanese sabre knife covered with blood was discovered 63 inches from the girl's body. Her automobile was found in the water of Elk Lick Dam in Pennsylvania with a forked stick lodged between the dashboard and the accelerator. Among other items, a panty girdle and pants were recovered from the glove compartment. Dr. Benedict Skitarelic, the medical examiner for Allegany County, performed the autopsy and found numerous blunt and sharp injuries on her skull and body. He stated that the victim's forehead and right temple were crushed, and that she received lacerations on her back made with a sharp instrument. Her throat was cut but there was no evidence of sexual molestation. The doctor estimated the time of death between the hours of 12:00 midnight and 6:00 a.m. on May 28, 1967. He determined that the cause of death was a crushed skull.

On Monday, May 29, 1967, the appellant, aged sixteen, born September 27, 1950, was taken into custody from his ninth grade classroom in Meyersdale High School, Meyersdale, Pennsylvania, by Pennsylvania State Trooper Ronald Delano and State Probation Officer William Long at 2:00 p.m. He was taken to the Meyersdale City Council room at 2:10 p.m. where he was turned over to Maryland State Trooper Bernard Chabot and Allegany County Investigator William F. Baker. Mr. Baker's testimony in this respect was:

"Q. What did you and Trooper Chabot say and do then?

A. I immediately warned the defendant of his full constitutional warning.

Q. What is that constitutional right warning?

A. I introduced myself. I told him that I was County Investigator William F. Baker of the State's Attor-

ney's office in Allegany County, Maryland. I told him that my companion was Trooper First Class Bernard J. Chabot of the Maryland State Police. I then stated the following: You have the absolute right to remain silent. The constitution requires that I so inform you of this right and you need not talk to me if you do not wish to do so. You do not have to answer any of my questions. Should you talk to me anything you might say in answer to my questions can and will be used and introduced into evidence in court against you. If you want an attorney to be present at this time or any time hereafter you are entitled to such counsel. If you cannot afford to pay an attorney one will be appointed for you if you so desire. Any statement you do make here must be made willingly, freely and voluntarily, without any threats or promises of reward being made to you. In view of these facts do you wish to give a statement and answer my questions. Gary Miller's answer was, 'Yes sir.' "

After being apprised of his constitutional rights, appellant was questioned from 2:10 p.m. until 3:45 p.m., at which time he gave an exculpatory statement and denied any complicity in the crime. After a five minute recess, until 3:50, then from 3:50 to 4:45 p.m., Mr. Baker and Trooper Chabot made a physical check of him, took photographs and removed certain personal property from him. Multiple abrasions, scratches and several thorns were found on appellant's body. At 4:55 p.m. he was turned over to Sheriff Walker of Somerset County, Pennsylvania, and was given a meal of two hamburgers and a milkshake.

After the investigating officers discussed the case further among themselves, they left the station to go to search appellant's home. As to what then transpired, Mr. Baker testified:

"While enroute to Gary Miller's residence at 6:10 P.M., we received a call via radio, State Police radio, to return to the Meyersdale Police Department. We did return to the Meyersdale Police Department at 6:20 P.M. At that time I was confronted with Sheriff Walker, who informed me that Gary Miller had asked

that we return to the Police Department, that he wanted to tell the truth. At 6:30 Gary Miller was brought into the Chief of Police's office, Paul Lotz, and at that time Trooper Chabot and I started to take a statement from Gary Miller. Again he was warned of his full constitutional rights.

\* \* \*

Q. Is this, these questions and answers were written or typed down by you at the time they were asked and answered? A. Yes sir. I'll explain that further. I would type the question and as Gary Miller answered my question I would type the answer and that followed through from the beginning of the statement to the end of the statement.

Q. Now would you read the beginning what the constitutional warning was and the questions and answers? A. The statement is headed 'Statement of Gary Lee Miller Given to County Investigator William F. Baker of the Allegany County, Maryland, and Trooper First Class Bernard J. Chabot of the Maryland State Police at the Meyersdale Police—

(Judge Naughton) We don't want to know what the beginning of the statement was. What was the constitutional warning I believe that was the question.

A. The following is the constitutional warning: You have the absolute right to remain silent. The Constitution requires that I so inform you of this right and you need not talk to me if you do not wish to do so. You do not have to answer any of my questions. Should you talk to me anything you might say in answer to my questions can and will be used and introduced into evidence in Court against you. If you want an attorney to be present at this time or any time hereafter you are entitled to such counsel. If you cannot afford to pay an attorney one will be appointed for you if you so desire. Any statement you do make here must be made willingly, freely and voluntarily without any threats or promises of reward being made to you. In view of these facts do you wish to give a state-

ment and answer my questions. And his answer was 'Yes sir.' "

(Judge Naughton) Now that was the warning you gave him before you took this statement that you are about to testify to?

A. Yes sir, that is correct.

Q. That is the second time you had given him the warning? A. Yes sir, that is correct.

Q. This interview was conducted at his request on this occasion? A. Yes sir, that is correct.

(Mr. Schindler) I'm going to object to the warning on the ground that he was not told that if he did answer any questions and changed his mind and then wanted to remain silent he could have remained silent after that. That hasn't been included in the warning.

(Judge Naughton) Objection overruled."

Then the lower court allowed Mr. Baker to read into evidence the unsigned statement made by Gary Lee Miller. Because of the importance of its admission into evidence we quote the statement in its entirety.

"Q. Proceed Mr. Baker please. A. Question: 'State your name, age, residence and occupation.' Answer: 'My name is Gary Lee Miller. I am sixteen years old. I live with my parents, Elsie Virginia Miller and Harold F. Miller, at R.D. 3, Box 88, Meyersdale, Pennsylvania. I am in the ninth grade at the Meyersdale Area High School.' Question: 'Gary, what if anything—

(Mr. Schindler) Objected to. I just want the record to show that there is an objection by the Defense to every question and every answer that is being given.

(Judge Naughton) Your objection has already been read Mr. Schindler.

A. Question: 'Gary, what if anything can you tell me about your activities on Saturday, May 27, 1967.' Answer: 'I got up about 7:00 o'clock that morning and went up to my grandmothers and visited until about 2:00 in the afternoon. There were some rela-

tives from Baltimore there. Then I went down to my house.' Question: 'What did you do then?' Answer: 'I asked Mother to run me out to Finzel after I cleaned up and got dressed. I was going to get a ride there to Frostburg.' Question: 'Did you take anything with you?' Answer: 'I think I had three dollars and some change and I took my knife with me. The reason I took my knife was because I had some trouble with some boys in Frostburg and I took it for protection. I had been taking it with me when I went to Frostburg.' Question: 'Can you describe the knife?' Answer: 'It had a brown handle and had a four inch blade with a hook on it. I bought it at Charlie Hill's in Frostburg. I think in March. I think some young girl waited on me and I paid $1.29 for it. I was alone when I bought it.' Question: 'Did your Mother take you to Finzel?' Answer: 'Yes, she dropped me off at Finzel about 5:30 P.M. I forgot to tell you it was a knife you could fold up. That's the way I carried it in my left front pocket.' Question: 'What did you do at Finzel?' Answer: 'I thumbed a ride with a guy that lives there. I don't know his name and got in Frostburg about 6:00. I went to the pool room and Teen Town and stayed at the two places until about 10:30 that night. I was by myself all evening. I didn't see anybody that I knew by name. I shot a couple games of pool.' Question: 'What did you do at 10:30 P.M.?' Answer: 'I went in front of the postoffice and started to thumb a ride. I talked to my parole adviser preacher, Dale Jenson, before I caught a ride. I got a ride with a stranger up to the Finzel bridge, walked up on the bridge, then caught another ride to the Catholic Hall right at the Maryland Line. I don't know who I caught the ride with. I think he was driving a '67 Fairlane, red.' Question: 'What time was that?' Answer: 'About 11:30 P.M. Then I started to walk toward home. It was raining off and on a little bit and I walked about a half mile. Then a string of cars started to pass so I started thumbing. Then this Corvair passed me up

about a hundred feet and then started to back up. Then I started running up to it and opened the door and got in. I saw it was Judy Ziegler, the driver.' Question: 'Do you know Judy Ziegler?' Answer: 'Yes, I've known her all my life and I went to school with her, but she was a couple grades ahead of me. That was at Meyersdale.' Question: 'What was said when you got in the car?' Answer: 'Judy said, "Oh, is that you Gary? I didn't recognize you." Then she acted like she was afraid.' Question: 'How do you know she was afraid?' Answer: 'She moved closer to the door and right out of the clear blue sky she said, "A lot of people around here don't believe that you did what you were accused of before." She said, "I, for one, don't believe it." ' Question: 'Can you give a definite location where you were picked up?' Answer: 'Between Finzel and Pocahontas and there is a foundation on the right side of the road nearby. Judy was going toward Pocahontas and so was I.' Question: 'What happened when Judy said, 'I, for one, don't believe it."? Answer: 'I looked over at Judy and tears were coming in her eyes. I had only been in the car about a minute and a half.' Question: 'What time did Judy pick you up?' Answer: 'It took me about ten minutes to walk the half a mile. It must have been about twenty minutes of twelve or it could have been a little later.' Question: 'What happened when you saw tears in Judy's eyes?' Answer: 'It started to rain a little more and then she said, "I'll just run you out to the house." To get out to my house you go straight and to get to her house you turn left. Right in Pocahontas.' Question: 'What took place then?' Answer: 'She drove another half a mile and by this time she broke out in tears again and was really crying. She stopped the car right along the right shoulder of the road. Then I asked her what was wrong and then was when she leaned over her, leaned her head over on my shoulder. Then she put her arm up around me and so I put my arm around her, pulled her in close to

me and asked her what was wrong.' Question: 'What was her reaction?' Answer: 'She put her head against my neck and then I kept asking her what was wrong. She kept crying and then she reached her head up and started to kiss the side of my neck and so then was when I thought she was wanting sex, the way she was acting.' Question: 'What did you do?' Answer: 'And so I kissed her on the neck. And then she moved completely out of her seat into mine. Her car has bucket seats. I put my hand down on her leg and started to move it up her leg and I said, "Can I?". She knew what I meant and she said, "Yes". She said, "We can't do it here. My father might come." And so I said, "Let's drive on down the road." Then she started to drive again.' Question: 'Where did she drive?' Answer: 'Down past the Rod and Gun Club and then we took a road out to Route 40. It was dirt. She just took that road. All the time she was driving out that road I got to thinking if we would have sex then she would holler rape on me. And so when she pulled over to stop about a mile down the dirt road toward Route 40 she said, "Here." I was starting to get scared and so I said, "No, go on out to Route 40 and drive down. I know a place where we won't get caught." So she drove down to Frostburg, down to Eckhart and then we went up the Hoffman Road. She was driving and when we got to where there is a dump where people throw things I said, "Here." She pulled over on the left side of the road.' Question: 'What did you do after stopping?' Answer: 'I moved over against her. We kept kissing each other on the lips and I played with her legs. I said, "Now" and I jumped over on my seat and took off all my clothes except my shirt.' Question: 'How were you dressed?' Answer: 'I had this shirt on, this blue shirt with a red pin stripe, black pants and these black Western boots.' Question: 'What time did you stop there at the dump on the Hoffman Road?' Answer: 'I had been in the car about an hour, about a quarter of one, that

is Sunday morning.' Question: 'What happened when you removed your clothing?' Answer: 'When I was doing that Judy crawled in the back seat and she took off hers, all of them. She asked me to unsnap her bra.' Question: 'How was Judy dressed?' Answer: 'She had like a pair of shorts on almost down to her knees, a dark color, a light color blouse with short sleeves, hose hooked on to I think a girdle, pants and a Kotex.' Question: 'How did you know she had a Kotex on?' Answer: 'I seen it. She put her clothes on the floor in the back.' Question: 'Was Judy menstruating?' Answer: 'I don't know whether she was or not.' Question: 'What took place then?' Answer: 'Then I crawled in the back seat and we tried to have sex but I couldn't get in. I tried several times but she was too small. I didn't play with her puss before trying to get it in.' Question: 'Did you have a hard on?' Answer: 'Yeah, the last time I tried to get it in she hollered out, "It hurts." And then she said, "I'm a virgin." It scared me when she hollered and I thought to myself that I didn't want to hurt her. She might turn me in to her parents. That was when I started to get shaky and nervous so I got up in the front seat and I started to dress right away. Then while I was dressing I said, "You had better get dressed. We can't do it." ' Question: 'Did Judy dress at that time?' Answer: 'Yes, but she bawled up some of her underclothing, I saw part of it was her girdle, and she said, "Put it in the glove compartment." I did. While she put the rest of her clothes on she started crying. I also put her hose in the glove compartment. Then she crawled up in the driver's seat. We were both dressed then.' Question: 'What took place then?' Answer: 'I asked her why she was crying and she didn't give me no answer. Then we saw a car coming toward us. We put our sun visors down and acted like we were just sitting there and when the car just passed us she was still crying. She jumped out of the car and she started to run toward the car. It was going toward Route 40.

Then Judy started hollering, "Help!" twice and like I started to panic and jumped out of the car and started running after her. Then she screamed "Rape" real loud. So I caught up with her and grabbed a hold of her and I waited until the car got out of sight. Then I left up on her. I didn't have her down. And Judy kept hollering with strange hollers and started kicking me.' Question: 'What did you do?' Answer: 'I grabbed a hold of her again around the arms and this is when I pulled the knife out of my left front pocket. I opened it and held the knife up so she could see it and I said, "Quit hollering, I don't want to have to hurt you." Then I grabbed her around the waist and tried to hold her arms. Then she kept on fighting and she broke free and that's when the knife cut her across the back someplace. Then I kept grabbing her and she would break free and every time she did the knife cut her. I had her down and she was trying to hold her, I had her down and was trying to hold her to keep her quiet. She hit me in the face too.'

(Mr. Schindler) I didn't get that last. Hold her what?

A. 'Then I kept grabbing her and she would break free and every time she did the knife cut her. I had her down and was trying to hold her to keep her quiet. She hit me in the face too. Then she broke free and ran down toward the woods on the left side of the road as the car was headed.' Question: 'Was Judy wearing glasses at that time?' Answer: 'She was wearing them but I think they came off when she got out of the car and was running.' Question: 'What did you do when Judy ran down in the woods?' Answer: 'She was down there about twenty feet and I ran after her. I grabbed hold of her and started swinging the knife at her.' Question: 'Why did you take the knife out of your pocket just before?' Answer: 'Because I panicked and was trying to scare her.' Question: 'Why did you start swinging the knife down in the woods?' Answer: 'To try to stop Judy from running away. I don't know how many times I cut her

but she broke away again. She ran up against a fence. I caught up with her again and I panicked and I started to swing the knife fast at her.' Question: 'What part of Judy did you strike with the knife?' Answer: 'I was just swinging it wildly and I don't know where it hit her. I had it in my right hand. Then I dropped the knife.' Question: 'What position were you in at this time?' Answer: 'She was on the ground and I was at the side of her. She rolled down the hill a little farther and started to scream, "I'm going to die." She said that several times. She rolled a little more and then she was throwing her body against the ground, beating her head against the ground and screaming, just giving screams, not saying any words. I think she was in pain.' Question: 'Did Judy say anything?' Answer: 'While she was on the ground rolling she said, "Gary, I love you." She said it twice. She kept on beating her head against the ground. Then all of a sudden she stopped and it seemed like blood and oxygen was rushing out of her nose just like it was bubbling. Then I started running up the hill, jumped in the car, headed out Cherry Lane and toward Frostburg.' Question: 'Why did you cut Judy, Gary?' Answer: 'I was throwing the knife because I didn't know what I was doing. I was scared.' Question: 'Where did you go?' Answer: 'Up through Frostburg and I was going fast and a car came out of one of the streets and it followed me all the way up to the Finzel bridge. That must have been about 2:30 A.M.' Question: 'How long were you there on the Hoffman Road with Judy?' Answer: 'I guess about an hour. I don't know how long I was out of the car with her, or how long we were down in the woods.' Question: 'What happened at the Finzel bridge?' Answer: 'The car that was following me went the other way and I went up the Finzel Road. Then I drove down to the Rod and Gun Club Dam that is near my home and that is when I decided to put the car in the dam. I got out and got a stick and put it and wedged

it between the dashboard and the gas pedal so the pedal would be all the way down. The motor was already going. I jumped out of the door, held the door open, reached over the steering wheel and pulled it down into gear. It is automatic transmission. The car shot in the Dam. It was maybe five or ten feet from the Dam.' Question: 'How far did the car go in the Dam?' Answer: 'I didn't see the Corvair any more. I just started to run and ran all the way home.' Question: 'Why did you put the car in the Dam?' Answer: 'I don't know. It just came in my mind.' Question: 'You went straight home?' Answer: 'Around 3:00 A.M. and I took a bath. I had blood on my hands. There was some on my wrist. There wasn't any on my clothing. Then I went to bed but I couldn't sleep. I fell asleep about 5:00.' Question: 'I show you here a knife with the name Sabre Japan written thereon with a brown wooden handle with a hooked blade that folds into the handle and ask you to identify it.' Answer: 'That is my knife and the one I used on Judy.' Question: 'Where are your black trousers you wore on Sunday, May 28, 1967?' Answer: 'They are at the bottom of my bed.' Question: 'Will you willingly and freely give the black pair of trousers to the investigating officers?' Answer: 'Yes, just tell Mom where they are and to give them to you.' Question: 'Were you injured while with Judy on the Hoffman Road?' Answer: 'She didn't hurt me but I got scratches in the woods on both my arms, but I forgot I do have black and blue marks on my legs from her kicking me but it didn't hurt, but I forgot to tell you down in the woods I did hit Judy twice with my right hand to get her to stop hollering. My right hand was sprained and so are the fingers. My knuckles on the right hand are cut too from swinging at her." Question: 'Did you strike Judy with any other article than your knife?' Answer: 'No, just a knife.' Question: 'You didn't hit her with any rocks?' Answer: 'No.' Question: 'Why did you assault Judy?' Answer: 'I just panicked when she

started to holler.' Question: 'Did you murder Judy?' Answer: 'I don't know.' Question: 'Gary, have you been treated fairly since being in custody today?' Answer: 'Yes.' Question: 'Has anyone, including Trooper Bernard J. Chabot, Sheriff Norman Walker, Trooper Ronald Delano, Parole Agent William E. Long, Deputy Sheriff Lewis Tyree, Sheriff Paul Haberlein, made any promises of reward to you, or have any of them, including myself, made any threats to you to obtain this statement?' Answer: 'No.' Question: 'Gary, have you given this statement willingly, freely and voluntarily or without any threat or promises of reward being made to you to obtain the same and do you realize this statement may be used against you in the prosecution of the case?' The answer is 'Yes sir.' At that time I asked Gary if he would sign the—

(Mr. Schindler) Just a moment. Have you finished with the statement? A. Yes sir.

(Mr. Schindler) I now make a motion to strike out the entire statement.

(Judge Naughton) Motion is denied."

The interrogation ended at 8:25 p.m., and from 8:25 to 8:40 p.m. Mr. Baker requested the appellant to sign the statement, but he refused, saying that he wanted to speak with his parents first. According to Mr. Baker and Trooper Chabot, Miller had made no prior requests to see his parents. They further stated that they had made no attempt to contact the parents, and that appellant did not ask for the presence of an attorney at that time. At 8:50 the boy was allowed to see his parents, who had learned where he had been taken. Upon their advice, Miller refused to sign the statement.

I

The appellant preliminarily argues that the lower court erred in allowing Mr. Baker to read the typed unsigned statement into evidence. The appellant's counsel raised objection to the reading by Baker of the first statement into evidence, which was exculpatory and was obtained from Miller at the first interrogation beginning at 2:10 p.m. on May 29 and ending at

3:45 p.m. Objection was made to this reading unless the witness needed the notes to refresh his memory. Before the lower court allowed Mr. Baker to read from his notes to refresh his recollection, it first inquired as to when the notes were taken and the witness replied: "These are from my original notes." Following this answer, the court then inquired: "When did you make your original notes?" and Mr. Baker responded, "At the time, at the time of the interview."

When the witness began to read the second statement which was inculpatory and was obtained from the appellant as a result of the second interrogation, which took place between 6:10 p.m. and 8:25 p.m., the appellant's counsel renewed his objection. Again the court asked the witness whether the statement, taken in the form of questions and answers, was written or typed by him at the time the questions were asked and answered. Mr. Baker responded: "Yes sir. I'll explain that further. I would type the question and as Gary Miller answered my question I would type the answer and that followed through from the beginning of the statement to the end of the statement." We find no merit in the appellant's contention that it was error to permit the State's witness to refresh his recollection. As set out in *Gault v. State,* 231 Md. 78, 80, 188 A. 2d 539, 541, *cert. denied,* 375 U. S. 851 (1963): "An oral confession that has been taken down but not signed may be admissible, or at least used to refresh recollection." *Hubbard v. State,* 2 Md. App. 364, 234 A. 2d 775; *Scott v. State,* 1 Md. App. 481, 231 A. 2d 728.

Appellant next questions the voluntariness of the oral statement which was admitted into evidence, relying principally upon *Miranda v. Arizona,* 384 U. S. 436 (1966), and *Haley v. Ohio,* 332 U. S. 596 (1948). In the landmark case of *Miranda* the Supreme Court set down the following guidelines governing custodial police interrogation: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." 384 U. S. at 444. Both Baker and Chabot testified that the appellant was twice informed of

his constitutional rights as stated above in *Miranda.* However, at trial, appellant's counsel objected to the warning given on the ground that Miller "was not told that if he did answer any questions and changed his mind and then wanted to remain silent he could have remained silent after that." Since such a warning was not required by *Miranda* we hold that the lower court properly overruled this objection.

Appellant's main argument urges that the State has failed to discharge its heavy burden imposed by *Miranda* to prove that the individual in custody "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." As defined in *Johnson v. Zerbst,* 304 U. S. 458 (1938), waiver of a fundamental constitutional right is usually "an intentional relinquishment or abandonment of a known right or privilege. The determination of . . . [which] must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." 304 U. S. at 464. However, a statement by the accused that he fully understands and waives his rights is not an essential link in the chain of proof. Waiver may be shown by the attendant circumstances. *United States v. Hayes,* 385 F. 2d 375 (4th Cir. 1967), *cert. denied,* 390 U.S. 1006 (1968) ; *Brown v. State,* 3 Md. App. 313, 239 A. 2d 761.

In the instant case, there is no allegation that the appellant was mistreated while he was in custody. Both Baker and Chabot stated that they made no promises or inducement in order to get the appellant to make a statement. See *Robinson v. State,* 3 Md. App. 666, 240 A. 2d 638. The uncontradicted testimony established that Miller was advised of his constitutional rights and then questioned for one hour and thirty-five minutes during which time he denied any implication in the crime. The interrogation ceased. After he had been fed, appellant himself requested to speak with the officers again. At the beginning of this interview, the officers again informed Miller of his constitutional rights. When Mr. Baker asked: "In view of these facts [warnings], do you wish to give a statement and answer my questions?" the appellant responded "Yes sir." We are aware that the Supreme Court has emphasized that admis-

sions of juveniles require special caution. *E.g., In re Gault,* 387 U. S. 1 (1967); *Haley v. Ohio, supra.* However, the appellant agreeing to give a statement coupled with the attendant circumstances, that is the proper constitutional warnings at the beginning of each questioning period, no allegations of any police misconduct, and *appellant's own request* for the interview when he gave his inculpatory statement, persuade this Court that the appellant, after careful and deliberate consideration, waived his constitutional privileges, and made his statement voluntarily.

A further important objection to the admissibility of the statement appears to be the appellant's age. This Court and the Court of Special Appeals have held that the age of an appellant, in itself, does not render a confession involuntary. *E.g., Green v. State,* 236 Md. 334, 203 A. 2d 870; *Bean v. State,* 234 Md. 432, 199 A. 2d 773; *State v. Hance,* 2 Md. App. 162, 233 A. 2d 326; *Harris v. State,* 1 Md. App. 318, 229 A. 2d 604. In *Harris,* the appellant, a fifteen year old boy, was convicted of murder by a jury in April 1966. The evidence included a confession. After the Court of Special Appeals held that the *Miranda* guidelines need not be applied retroactively, it stated that the test of the admissibility of a statement depends upon "whether it was freely and voluntarily made and whether it was so made depends on the facts and circumstances of the case." The court further stated: "The record in the instant case disclosed that appellant had an eighth grade education and there was nothing to indicate that he did not understand what he was saying or comprehend what he was doing." 1 Md. App. at 323, 229 A. 2d at 607.

Appellant's reliance upon *Haley* is misplaced. In that case a boy of fifteen was convicted of first degree murder upon evidence which included a confession. The youth was arrested at midnight and was taken to police headquarters where he was questioned by the police for about five hours, at which time he confessed to the crime. There was some evidence that he had been beaten during that time. Haley was not advised of his right to an attorney, was not allowed to see his mother for five days, and he was not taken before a magistrate and formally charged until three days after he confessed. The Supreme Court held that the methods used in obtaining this confession did

not comply with the due process clause of the Fourteenth Amendment of the United States Constitution. In explaining its decision the Court stated: "The age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights combine to convince us that this was a confession wrung from a child by means which the law should not sanction." 332 U. S. at 600-01. In *Haley*, the callous attitude of the police included their refusal on two occasions to let a lawyer retained by the boy's mother speak with his client, their refusal for five days to allow the boy's mother to see him, and their failing to present him before a magistrate with appropriate speed. None of these elements are present in the instant case. Miller was told on two separate occasions that he had a right to an attorney and his parents were allowed to see him the evening of his arrest. Again, there has been no allegation of misconduct on the part of the officers during the short periods of interrogation.

This Court is not unmindful of *Gallegos v. Colorado,* 370 U. S. 49 (1962), however, we feel that the totality of circumstances present in that pre-*Miranda* case are distinguishable in the case at bar. Recent cases from other jurisdictions show that this Court is not alone in holding that a young accused may waive his constitutional rights and make a voluntary statement admissible in evidence. For example, in *State v. Clough,* 147 N.W.2d 847 (Iowa, 1967), the Supreme Court of Iowa held admissible the oral and written statements of a seventeen year old boy where the facts showed that his statements were voluntary, that there was no indication of mistreatment, and the youth was advised that he did not have to tell the interrogating officers anything. Likewise, in *People v. Cocroft,* 225 N.E.2d 16 (Ill., 1967), a seventeen year old defendant was convicted of murder. In upholding the admissibility of two confessions, the Supreme Court of Illinois stated that ". . . we hold that the mere facts that defendant was a minor and had an eighth grade education did not make the confessions incompetent *per se,* although they were attendant circumstances to be considered in determining the voluntariness and admissibility of his statements." 225 N.E.2d at 18.

The lower court in the instant case ruled that the State had met its required burden to establish that the statement had been freely and voluntarily given, and that appellant knowingly and intelligently waived his constitutional rights. We can not say that the court erred in so holding. The determination of whether a confession is admissible is ordinarily a matter for the trial court to decide and its determination will not be disturbed on appeal unless there is a clear abuse of discretion. *Abbott v. State,* 231 Md. 462, 190 A. 2d 797; *Bryant v. State,* 229 Md. 531, 185 A. 2d 190; *Harris v. State, supra.* We find no such abuse here.

## II

Appellant's second argument urges that the evidence was insufficient to convict him. The function of this Court, in reviewing the sufficiency of the evidence in a non-jury case, is not to decide whether it would have reached a different result from that of the trial court, but whether the lower court had sufficient evidence from which it could have been fairly convinced beyond a reasonable doubt of the defendant's guilt of the offense charged. *Graczyk v. State,* 233 Md. 245, 196 A. 2d 469; *Tasco v. State,* 223 Md. 503, 165 A. 2d 456, *cert. denied,* 365 U. S. 885 (1961); *Cooper v. State,* 220 Md. 183, 152 A. 2d 120. The verdict will not be set aside unless clearly erroneous, and due regard must be given to the opportunity of the trial court to judge the credibility of the witnesses. Maryland Rules 772 and 886 a; *Campbell v. State,* 240 Md. 59, 212 A. 2d 747; *Wesbecker v. State,* 240 Md. 41, 212 A. 2d 737; *Jacobs v. State,* 238 Md. 648, 210 A. 2d 722; *Cooper v. State, supra.*

We have already held that the lower court did not err in admitting appellant's statements into evidence. However, the well established law in this State is that an extrajudicial confession or statement of the accused does not warrant a conviction unless there is independent evidence to establish the *corpus delicti. Hadder v. State,* 238 Md. 341, 209 A. 2d 70; *Pierce v. State,* 227 Md. 221, 175 A. 2d 743; *Koprivich v. State,* 1 Md. App. 147, 228 A. 2d 476. The sufficiency of this independent evidence need not establish, by itself, the *corpus delicti* beyond a reasonable doubt, but any facts and circumstances that are substantial in nature and fortify the truth of the confession or

statement are sufficient to support a conviction. *Hadder v. State,* and *Koprivich v. State,* both *supra.* Such proof does not have to be full and positive and it may be circumstantial in nature, when direct evidence is not available. *Cooper v. State, supra, Bollinger v. State,* 208 Md. 298, 117 A. 2d 913; *Davis v. State,* 202 Md. 463, 97 A. 2d 303.

With these principles in mind, we examine the evidence of the *corpus delicti* independent of Miller's statement to the officers. First, the battered and lacerated body of the victim was found at a location narrated by Miller, who accurately described what she had been wearing. A Japanese sabre knife was found close to the body where appellant acknowledged that he dropped his knife and the fact that he owned a knife of that type was verified by several of his acquaintances. Physical evidence which gives substantial support to appellant's inculpatory statement included: (1) the nature of the girl's injuries was in keeping with his account; (2) the missing glasses of the deceased found at the scene substantiated his story in this respect; (3) the finding of the undergarments in the glove compartment as stated by Miller; and (4) appellant's physical condition as observed by the officers as to bruises. There was also sufficient testimony which corroborated Miller's admission: (1) the testimony of numerous witnesses who verified his story as to the course of his trip home on the evening in question; (2) the testimony of the friends of the deceased indicated that she should have been in the same area as Miller at the time he stated she gave him a ride; and (3) appellant's statement that the victim was "hollering" was supported by Mrs. Robinson's statement that she heard a woman screaming "I'm going to die." In addition, Trooper Chabot stated that he and two other officers overheard the appellant admit to a fellow jail inmate that he had killed a girl. This testimony as to Miller's admission was corroborated by Somerset County Sheriff Walker and Dennis Berkheimer, the prisoner with whom the appellant had been conversing. Another prisoner, Charles Schaffold, also testified that Miller admitted committing the crime.

A careful review of the entire record convinces us that there was no reversible error committed by the lower court so that the judgment must be affirmed.

*Judgment affirmed.*

Barnes, J., concurring:

I fully concur in the result in this case, in the analysis of the various cases and in the reasoning of the majority in its excellent opinion, if it be assumed, arguendo, that the provisions of the Fifth Amendment of the Constitution of the United States in regard to self incrimination and of the Sixth Amendment in regard to the assistance of counsel are applicable to the States through the due process clause of the Fourteenth Amendment. As I am firmly of the opinion that selected provisions of the first eight amendments to the federal Constitution are not applicable to the States through the due process clause of the Fourteenth Amendment and that this new and unexplained theory of federal constitutional law is destructive of the proper federalism upon which the government of this country rests, I wish to reiterate my opinion in this regard. I have given my reasons for my opinion in prior dissenting or concurring opinions in *State v. Giles,* 245 Md. 660, 667-69, 229 A. 2d 97, 101-02 (1967); *Truitt v. Board of Public Works,* 243 Md. 375, 411-13, 221 A. 2d 370, 392-93 (1966); *State v. Barger,* 242 Md. 616, 628, 639-44, 220 A. 2d 304, 311, 317-20 (1966) and these reasons need not be repeated here.

In *Truitt v. Board of Public Works, supra,* I expressed the hope "that the [majority of the] Supreme Court * * * would return to more orthodox constitutional doctrine" and thus avoid corrective action by Congress which may be undertaken under Article III, Section 2 of the federal Constitution or under Section 5 of the Fourteenth Amendment as outlined in my dissenting opinion in *State v. Giles, supra.* I again express this hope. As I see it, there is yet time for the majority of the Supreme Court to return to correct constitutional doctrine, but the hour grows late.