# IN RE FLETCHER

[No. 384, September Term, 1967.]

*Decided December 4, 1968.*

522

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, and SMITH, JJ.

*Lawrence Kotin* for appellant.

*David T. Mason, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *William B. Yates, II, State's Attorney for Dorchester County,* on the brief, for appelleee.

FINAN, J., delivered the opinion of the Court.

This is an appeal from an adjudication of delinquency entered against Dennis P. Fletcher (Fletcher), a sixteen year old negro youth, in the Circuit Court for Dorchester County, sitting as a Juvenile Court, on August 23, 1967, and a subsequent order of commitment placing Fletcher in the custody of the Department of Juvenile Services for an indefinite period.

On July 25, 1967, between 1:30 A.M. and 2:00 A.M., Schroeder's Store and the Pine Street School, in the City of Cambridge, were fire bombed and burned during a night marked by confusion and racial violence. An investigator for the Maryland Fire Marshal's Office, Top E. Barnes, Jr. (Barnes), was assigned to investigate these fires. On August 2, 1967, shortly after midnight, a written statement was obtained from one Pamela Waters, a fourteen year old eyewitness, who implicated Fletcher in the setting of the fires, and a warrant was immediately obtained for Fletcher's arrest.

At approximately 2:00 A.M., on August 2, 1967, two Cambridge police officers went to the home of Fletcher, a school dropout with an eighth grade education, where they found both him and his mother.

One of the officers testified that they told the mother (the boy being fatherless) that they had a warrant for her son and proceeded to read it to her. The officers then placed Fletcher under arrest and took him to the office of the Sheriff for

Dorchester County. The officers did not suggest, nor did Fletcher's mother request, that she accompany her son to the sheriff's office. The City of Cambridge at this time was still under limited martial law due to the recent civil disorder.

At the sheriff's office Fletcher was taken to an interrogation room where he was confronted with Barnes, Officer Randall F. Anderson of the Cambridge Police Department and William Yates, State's Attorney for Dorchester County. Also present during part of this time was Corporal Randolph Jews of the Cambridge Police Department. Corporal Jews was the only negro present other than Fletcher.

According to the testimony of the State's witnesses, after Fletcher entered the interrogation room the *Miranda* warnings were read to him from a slip of paper by Barnes.[1] Fletcher was then asked if he understood what had been read to him and he answered in the affirmative. Barnes then informed Fletcher that he had a right to call his parents and advise them of where

---

1. Excerpt from direct testimony of Top Ellis Barnes, Jr., State Fire Inspector:

\* \* \*

"Q. Read it just like it was read to him.

A. Mr. Dennis Fletcher, we are now questioning you as a suspect in a fire which occurred on July 25th, 1967. Now you have an absolute right to be silent. You do not have to tell us anything or answer any question we ask you if you do not want to say anything respecting your right not to talk to us. If you want to make a statement or answer our questions, anything you say may be used against you in a court of law.

You also have a right to a lawyer and to be alone with him before questioning. If you are not able to afford a lawyer but want one, we will have one appointed for you.

If you decide to talk with us without a lawyer present but want to stop during the questioning and have a lawyer present, you may do so.

You are not promised anything for giving us this or any other statement.

Q. Did he understand what you read to him?

A. I asked, 'Dennis, did you understand what I have read to you from this card? Do you understand that you may have a lawyer present before I ask you any questions?' Dennis said, 'Yes, I understand.'"

he was being held for questioning and Fletcher stated that he did not wish to make a phone call because he did not want his mother to know "what he was brought in for." Fletcher had been advised of the charges against him and stated that he did not want to make any statement at that time, except he would admit that he was there. Fletcher did not want to say anything further and was advised by Barnes that it was his right to remain silent but that even if he did so, charges were going to be placed against him. Sometime during this interval the inculpating statement of Pamela Waters was read by the State's Attorney to Fletcher. Barnes then took Fletcher from the interrogation room to a cell but on the way to the cell Fletcher said, "Look man, I want to get it off my chest. I will give you a statement. Take me back to the room." Barnes returned with him to the interrogation room where the *Miranda* warnings were again read to him. He was also asked if he wanted to call his mother which he was permitted to do using the telephone in the interrogation room. After calling and speaking with his mother he was permitted to place a second call to a number which was out of order. It was at that time that he said he understood what he had been told and was ready to give a statement. Fletcher admitted in an unsigned statement that he was involved and participated in the fire bombing of Schroeder's store and the burning of the Pine Street School. This statement was given about twenty minutes after questioning commenced and about an hour after he had been taken into custody. After this statement the State's Attorney and Barnes left the room, with Fletcher and Corporal Jews remaining. Corporal Jews reminded Fletcher that he had known him all of his life and had always treated him "like a man." Fletcher repeated to Corporal Jews his statement that he had participated in the setting of the two fires. At several intervals during the interrogation Fletcher asked the police officers to bring in another juvenile named Douglas who was also allegedly involved in the setting of the fires and Fletcher urged Douglas to give a confession, but Douglas refused to do so. A juvenile proceeding was held in the Circuit Court for Dorchester County to determine if Fletcher was a delinquent minor. Testimony was heard from Pamela Waters who said she witnessed the conduct of Fletcher

on the night in question and from Barnes, Officer Anderson and Corporal Jews who testified to the statements given by Fletcher and the circumstances surrounding them. Fletcher in his testimony denied that he had made any statements to the authorities and said that he did not remember the *Miranda* warnings having been read to him.

At the commencement of the proceedings in Juvenile Court the appellant's counsel moved for a change of venue, during the hearing he moved for sequestration of witnesses and at the conclusion of the hearing moved for a new trial, all of which were denied by the court on the grounds that such motions could not properly be entertained in juvenile proceedings. Appellant's counsel also raises on appeal the fact that the court informed the appellant and his counsel that he was not entitled to a jury trial in juvenile proceedings, however, assuming *arguendo,* that such a right existed, the record is barren of any motion for a jury trial having been made by Fletcher's counsel.

During the hearing appellant's counsel made timely objections to the introduction in evidence of the testimony of the two oral statements made by the appellant during his in-custody interrogation on the premise that the statements were taken in violation of the privilege afforded the appellant against self-incrimination as guaranteed by the Fifth Amendment to the Constitution of the United States, as construed by the United States Supreme Court in *Miranda v. Arizona,* 385 U. S. 541 (1966) and as applied by that Court to juvenile proceedings in *In Re Gault,* 387 U. S. 1 (1967).

At the close of all of the testimony the Court declared Fletcher to be a delinquent and committed him to the custody of the Department of Juvenile Services for an indefinite period. It is from that order that this appeal is taken.

## The In-Custody Oral Admissions

This case bears a striking similarity to *Miller v. State,* 251 Md. 362, 247 A.2d 530, recently decided, by this Court. In *Miller,* there was the more serious charge of murder and the sixteen year old defendant was tried as an adult, however, the circumstances surrounding the in-custody interrogation, and the interrogation itself, are remarkably parallel to the instant case.

The reliance of the youthful defendants in both cases on *Miranda* and *Gault* and this Court's measuring of *Miller* in relation to *Miranda* and *Gault*, warrants a retelling of the facts of *Miller*, for what we did in *Miller* must be reflected in our opinion in this case.

In *Miller* the sixteen year old suspect was taken from his ninth grade classroom in Meyersdale, Pennsylvania, at 2:00 P.M. by a Pennsylvania State Trooper and a probation officer, to the Meyersdale City Council room. There he was turned over to a Maryland State Trooper and the criminal investigator for Allegany County, Maryland. The *Miranda* warnings were read to him and he was questioned for an hour and 35 minutes but denied any complicity in the crime. A physical examination was also made of his person to determine whether he had sustained any recent bruises, abrasions or scratches. He was then turned over to the Sheriff of Somerset County, Pennsylvania, and was given a snack to eat. The Maryland officers left to travel to the suspect's home and enroute were contacted by the sheriff and notified to return to his office as the suspect stated he wanted to tell the truth. The Maryland officers returned and again read the *Miranda* warnings to the suspect a second time. The second interrogation, during which the oral confession was made, lasted one hour and 55 minutes. The suspect refused to sign the statement until he had had an opportunity to speak with his parents. The suspect had made no prior request to contact his parents and the police officers had made no attempt either to contact the parents or notify them as to the whereabouts of their son. At no time did the appellant ask for an attorney. He had stated that he understood what his constitutional rights were, when they had been read to him. During the latter part of the suspect's interrogation his parents, after finding out from a source other than the police officers as to the whereabouts of their son, had come to the sheriff's office and were waiting in another area. About 25 minutes after the suspect had given his inculpatory statement they were allowed to see him whereupon acting on their advice the suspect refused to sign his statement.

In the instant case, as in *Miller*, the *Miranda* warnings were read to the appellant and he stated that he understood them. In

the instant case, as in *Miller,* the appellant did not wish, at first, to make a statement but subsequently had a change of mind and informed those in charge of custody that he wished to make a statement, at which time the *Miranda* warnings were read a second time. In the instant case, as in *Miller,* there is no evidence of any prolonged or grueling questioning, physical abuse, threats of physical abuse or other form of intimidation, nor were any inducements offered. In contrast to *Miller,* in the instant case, the mother of the appellant knew when her son was taken into custody, by whom he had been taken into custody and where he was being taken. In contrast to *Miller,* after the first reading of the *Miranda* warnings and before any statements had been made, the police officer asked the appellant whether he wished to contact his parents, and in further contrast, the appellant after deciding to make an inculpatory statement, requested that he be allowed to telephone his mother and made the call.

> Judge Marbury speaking for the Court in *Miller* said:
> "Appellant's main argument urges that the State has failed to discharge its heavy burden imposed by *Miranda* to prove that the individual in custody 'knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' As defined in *Johnson v. Zerbst,* 304 U. S. 458 (1938), waiver of a fundamental constitutional right is usually 'an intentional relinquishment or abandonment of a known right or privilege. The determination of . . . [which] must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' 304 U. S. at 464. However, a statement by the accused that he fully understands and waives his rights is not an essential link in the chain of proof. Waiver may be shown by the attendant circumstances. *United States v. Hayes,* 385 F. 2d 375 (4th Cir. 1967), *cert. denied,* 390 *U. S.* 1006 (1968) ; *Brown v. State,* 3 Md. App. 313, 239 A. 2d 761.

"* * * At the beginning of this interview, the officers again informed Miller of his constitutional rights. When Mr. Baker asked : 'In view of these facts [warnings], do you wish to give a statement and answer my questions?' The appellant responded 'Yes sir.' We are aware that the Supreme Court has emphasized that admissions of juveniles require special caution. *E.g., In re Gault,* 387 U. S. 1 (1967) ; *Haley v. Ohio, supra.* However, the appellant agreeing to give a statement coupled with the attendant circumstances, that is, the proper constitutional warnings at the beginning of each questioning period, no allegations of any police misconduct, and appellant's own request for the interview when he gave his inculpatory statement, persuade this Court that the appellant, after careful and deliberate consideration, waived his constitutional privileges, and made his statement voluntarily.

"A further important objection to the admissibility of the statement appears to be the appellant's age. This Court and the Court of Special Appeals have held that the age of an appellant, in itself, does not render a confession involuntary. *E.g., Green v. State,* 236 Md. 334, 203 A. 2d 870; *Bean v. State,* 234 Md. 432, 199 A. 2d 773; *State v. Hance,* 2 Md. App. 162, 233 A. 2d 326; *Harris v. State,* 1 Md. App. 318, 229 A. 2d 604. * * *."

The appellant in this case further contends that *Gault* extended *Miranda* warnings to pre-trial custodial interrogation in juvenile proceedings; assuming, *arguendo,* that it does, there was compliance with it in this case on two different occasions. See *In Re Creek,* 243 A. 2d 49 (1968) and *Leach v. Texas,* 428 S.W.2d 817 (1968). We emphasize that the *Miranda* warnings were repeated twice in this case because in *People v. Hill,* 233 N.E.2d 367, 371 (1968), the Supreme Court of Illinois made it clear that, "* * *once *Miranda's* mandate was complied with at the threshold of the questioning it was not necessary to repeat the warnings at the beginning of each successive interview. * * *." We also cite *Hill, supra,* as the reason it

was not necessary to repeat the *Miranda* warnings a third time when the appellant was having his conversation with Corporal Jews, there having been no significant lapse of time or change in environment from the first and second rendition of the warnings.

Viewing the facts and circumstances surrounding the in-custody interrogation in the instant case, we are of the opinion that the appellant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

The appellant relying on *Gault,* also argues that he was denied due process of law because the record does not affirmatively show that his mother was advised of his constitutional right to remain silent and have the assistance of counsel during interrogation.

We do not think that *Gault* holds that the due process clause of the Fourteenth Amendment which requires that in juvenile proceedings the parents must be notified of the child's rights to be represented by counsel retained by them or, if they are indigent, by court appointed counsel, extends to pre-trial custodial interrogation of the juvenile. Nor do we think that *Gault* requires that the parent be advised of the right of the juvenile to remain silent at a pre-trial custodial interrogation. In the instant case the appellant at the juvenile proceedings was given all of the protection mandated by *Gault.*

*Motions for Change of Venue, Sequestration of Witnesses, New Trial and Jury Trial in Juvenile Proceedings.*

We treat these motions for change of venue, sequestration of witnesses, new trial and jury trial under one category in this opinion because the appellant, knowing full well that juvenile proceedings are of a special nature designed by statute to meet the problems peculiar to the adolescent, has through his spate of motions launched a frontal attack on the juvenile procedure followed in this State (Code (1966 Repl. Vol.) Art. 26, §§ 51-71).

His thesis is that because these motions are not available to defendants in juvenile proceedings, the juvenile is deprived of the due process of law afforded by the Fourteenth Amendment.

Mr. Justice Fortas in *Gault,* delivered a strong indictment against the juvenile proceedings as they exist today in most of the 50 states. We must say that this well documented opinion contained much to justify his criticism. However, the Supreme Court certainly stopped short of insisting that built-in protections afforded minors in juvenile proceedings be discarded and that they be tried in all cases like adults. It is evident that the Supreme Court believes that juveniles have in the past suffered the worst of both worlds and it is also evident that its objective is to obtain for the juvenile the best of both worlds. This goal is commendable. We think that it can be achieved within the framework of the juvenile process which we have in this State which, while showing proper respect for due process, does not subject juvenile hearings to all of the options identified with adversary criminal trials.

In *In Matter of Cromwell,* 232 Md. 409, 194 A. 2d 88 (1963) we said: " * * *If, as some authorities suggest and our own Rules reflect, juvenile proceedings should be conducted without strict regard for the usual court rules, we think there is at least a minimum standard of fairness that must be observed. * * *." *Id.* 415. We think this is in accord with what Mr. Justice Fortas said in *Gault:*

> " * * * Of course, it is not suggested that juvenile court judges should fail appropriately to take account, in their demeanor and conduct, of the emotional and psychological attitude of the juvenile with whom they are confronted. While due process requirements will, in some instances, introduce a degree of order and regularity to juvenile court proceedings to determine delinquency, and in contested cases will introduce some elements of the adversary system, nothing will require that the conception of the kindly juvenile judge be replaced by its opposite, *nor do we here rule upon the question whether ordinary due process requirements must be observed with respect to hearings to determine the disposition of the delinquent child.*" (Emphasis supplied.) 387 U. S. 1, 26 (1967).

Certainly, Mr. Justice Stewart in his strong dissent in *Gault*

believed that the distinction between juvenile proceedings and adversary criminal trials should be maintained.

We think that the United States Supreme Court in *Kent v. United States*, 383 U. S. 541 (1966), explicitly disclaimed any inference or suggestion that juveniles must be treated exactly like adults in criminal proceedings when it said:

> "We do not mean * * * to indicate that the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearing; but we do hold that the hearing must measure up to the essentials of due process and fair treatment."
> *Id.* 562.

The appellant, as one of his assignments of error, cites the denial of his motion for a change of venue, assuming, *arguendo,* that such a motion may properly be made in a juvenile proceedings, in this instance it may be disposed of on technical grounds as the appellant did not comply with Maryland Rule 738 a and b. There was no suggestion under oath signed by the appellant (or anyone on his behalf) that he could not obtain a fair and impartial trial in Dorchester County; nor did he offer any evidence of existing prejudices affecting him, other than the general reference by counsel, to the charged atmosphere of Cambridge and the coverage of the events concerning the conflagration as published by the newspaper.

However, the more elementary reason for affirming the lower court's action in denying this motion is that, in our opinion, there is no constitutional or statutory right of removal, or change of venue in juvenile causes in this State. See Art. 26, § 51 et seq.; Maryland Rule 901, et. seq.; *Bullock v. State,* 230 Md. 280, 186 A. 2d 888 (1962).

Although in *Bullock* we were presented with an action to determine the status of a defective delinquent, as distinguished from a juvenile proceedings, we think the rationale of *Bullock* covers both situations. In short, as was said by this Court in *Bullock:* "The statute not only affords no right of removal, but, on the contrary, clearly negates any inference that a removal was ever contemplated." *Id.* 286.

Also, in answering the appellant's contention that it was error for the court to have denied his motions for a new trial, we again turn to what this Court said in a proceedings involving a defective delinquent wherein a motion for a new trial was requested by the State. In *Austin v. Director,* 245 Md. 206, 225 A. 2d 466 (1967) we stated:

"While it is true that defective delinquent proceedings have been classified as civil in nature * * * and that in ordinary civil proceedings a court of general jurisdiction has inherent power to grant a new trial, it is also true that courts of special jurisdiction have no power to grant a new trial except as given to them by statute. See 39 Am. Jur., *New Trials* § 4; 66 C.J.S., *New Trials* § 2 c." *Id.* 211.

We find no authority, either under the Maryland Rules or any statute, providing for a new trial in juvenile proceedings in this State.

Assuming, without deciding, that the juvenile court had power to grant a new trial, again we find that the appellant failed to comply with the rules relating to the filing of such a motion. See Code (1967 Repl. Vol.) Art. 27, § 594 and Maryland Rule 567. In the instant case the appellant's counsel at the conclusion of the proceedings stated that he would like to make a motion for a new trial. The Court informed him that such a motion did not exist in juvenile proceedings and appellant's counsel failed to file any written motion requesting a new trial as prescribed by Rule 567.

The appellant also complained of the failure of the court to grant his request for sequestration of witnesses. Again, we find nothing in the Rules which would extend this procedure to juvenile proceedings; however, it should be noted that this Court in interpreting Maryland Rule 546 and Rule 753, which provide for sequestration of witnesses in civil and criminal proceedings respectively, has held, that although the rule is mandatory upon the trial court, violation of the rule is not *per se* reversible error. It must be shown that some prejudice resulted to the defendant by the failure of the observance of the rule. *State Roads v. Creswell,* 235 Md. 220, 201 A. 2d 328

(1964) ; *Swift v. State,* 224 Md. 300, 167 A. 2d 762 (1961) ; *Bullock v. State,* 219 Md. 67, 148 A. 2d 433 (1959) ; *Breeding v. State,* 220 Md. 193, 151 A. 2d 743 (1959). We repeat again, juvenile court proceedings are of a special and informal nature. See *Ex Parte Cromwell,* 232 Md. 305, 192 A. 2d 775 (1963) ; *In Matter of Cromwell,* 232 Md. 409, 194 A. 2d 88 (1963) ; *Moquin v. State,* 216 Md. 524, 140 A. 2d 914 (1958).

Finally, the appellant alleges that it was error for the lower court not to grant his alleged request for a trial by jury. Maryland, in line with most jurisdictions, does not provide for a jury in juvenile court proceedings. Last year the constitutionality of such a denial of trial by jury in a juvenile proceedings was before the Supreme Court of Pennsylvania and in rejecting the juvenile's request for a jury trial, after weighing it in the light of *Gault, supra,* the Court said :

> "In summary, we are in full agreement with the holding of the Supreme Court that the constitutional safeguards of the Fourteenth Amendment guaranteed to adults must similarly be accorded juveniles. It is inconceivable to us, however, that our highest Court attempted, through *Gault,* to undermine the basic philosophy, idealism and purposes of the juvenile court. We believe that the Supreme Court did not lose sight of the humane and beneficial elements of the juvenile court system; it did not ignore the need for each judge to determine the action appropriate in each individual case; it did not intend to convert the juvenile court into a criminal court for young people. Rather, we find that the Supreme Court recognized that juvenile courts, while acting within the constitutional guarantees of due process, must, nonetheless, retain their flexible procedures and techniques. The institution of jury trial in juvenile court, while not materially contributing to the fact-finding function of the court, would seriously limit the court's ability to function in this unique manner, and would result in a sterile procedure which could not vary to meet the needs of delinquent children. Accordingly, we reject appellant's

request for a jury trial." *Pennsylvania v. Johnson*, 234 A. 2d 9 (1967).

As a practical matter in the instant case we do not think that appellant's counsel ever made a motion for a jury trial, the following colloquy having occurred between the appellant's attorney and the court:

> "I would like to have read in the record not permitted to have a jury trial, instructed the defendant didn't have a right to jury trial. On those grounds, dismissal of the petition and because this constituted a denial under the protection of the law of the Gault case, Fourteenth Amendment.
>
> (The Court) Are you really asking for a jury trial?
>
> (Mr. Kotin) Well, the Court, early in the trial, passing, said they weren't entitled to jury trial, sir.
>
> (The Court) All right."

Certainly this exchange between appellant's counsel and the court was not sufficient compliance with Maryland Rule 522 b as to have preserved the issue of a denial of a motion for trial by jury for review by this Court on appeal (Maryland Rule 885).

*Order affirmed.*