STATE, Respondent v. GRAVES, Appellant

(163 N.W.2d 542)

(File No. 10549. Opinion filed December 19, 1968)
Rehearing denied February 24, 1969

**Frank L. Farrar,** Atty. Gen., **Michael Strain** and **Edward M. Blando,** Asst. Attys. Gen., Pierre, **R. James Brennan,** State's Atty., Rapid City, for plaintiff and respondent.

**Kelton S. Lynn,** Rapid City, for defendant and appellant.

BIEGELMEIER, Judge.

Defendant was prosecuted for murder, convicted of first degree manslaughter and has appealed from his sentence. To the information charging defendant with causing the death of one Perry Stevens by strangulation, defendant entered his plea of not guilty and not guilty by reason of insanity.

The facts are summarized generally from those set out in appellant's brief. Defendant, a Negro, was an airman stationed at Ellsworth Air Force Base near Rapid City, South Dakota, and had been a member of the Air Force for about six years. During this time he had been assigned to Air Police duty guarding airplanes in Puerto Rico. During that time he had some difficulties because his present wife had become pregnant prior to their marriage and he had married her over objections of his mother. He consulted an Air Force psychiatrist upon whose recommendation he was relieved of his Air Police duties and placed in a nonsensitive duty in the Commissary in which he was engaged at the time of the alleged crime. He had two daughters who were living with him and his wife in Rapid City. Upon learning through a mutual acquaintance that Perry Stevens, also a Negro age 87 and a long-time respected resident of Rapid City, was desirous of meeting colored people, he visited Stevens in July 1966. Stevens owned a house next door to the home in which he resided and after some discussion Graves and his family moved into that house. At first a friendship developed in which Mrs. Graves did some favors for Stevens and defendant did some repair work on the rented house. Stevens paid defendant for that work. Stevens stated that he was going to leave the house to one of defendant's children. Defendant testified that he tried to talk him out of that as they did not plan to

make Rapid City their home. However, sometime later Stevens apparently changed his mind and said he was not going to leave the property as indicated and thereafter the relationship between them worsened. The agreed rental was $79.50 a month and on the afternoon of January 2, 1967 Graves went to Stevens' house to pay the rent and discussed reducing it. Defendant testified Stevens became upset, stated he could not do it and that as defendant had four $20 bills with him he told Stevens he would come back later on when he had change. He would then like to know Stevens' decision on the rent reduction request.

After returning from a movie about 10:30 p. m. with the $79.50 in change, Graves testified he went to the Stevens house to pay it and again brought up the rent reduction and an argument ensued. Graves further testified Stevens got belligerent saying that the family had done nothing for him, and the next thing he remembered was that they were on the floor in the living room and he had his belt around Stevens' neck. Graves then got up and went home. Without then telling his wife what he had done he asked if she heard some screaming which she said she did not. He told her Stevens wanted him to go to a drug store on an errand. She objected to this. He sat and watched television for a time, but he finally told her that he would put his car in the garage. This was after midnight. He then went back to the Stevens house and put Stevens in the trunk of his car, drove out west of Rapid City to an area he had visited before called Thunderhead Falls. On the way out he thought he heard noises or voices calling him. He stopped the car, opened up the trunk and dragged Stevens on the snowy road by pulling his belt which was around Stevens' neck and then threw him off the side of the road down the cliff. He arrived back home about 1 a. m. and went to bed alone.

The next morning his wife asked him what was wrong. He told her. About 11 a. m. he took the family to the airport to fly to their home in Louisiana. He then drove to the police station as he wanted to give himself up and tell them everything that happened. He waited for about 10 minutes as the lady receptionist was talking to people in line ahead of him and told her

he wanted to report a murder. She referred him to a detective Zakinski who was standing nearby to whom he said he would like to talk to someone about murdering a man last night. Zakinski said, "what did you say" and Graves said, "I killed my landlord." Zakinski spoke to Detective Boze who replied he heard the statement and the three of them walked into Boze's office. Boze asked defendant his name, where he lived, where he was employed and the landlord's name, whereupon Boze testified defendant said:

> " 'I don't know for sure if he is dead. But, he probably is by now. I strangled him, and, I said, how and he said with a belt and I said, where and he said, at his home at 615 Chicago Street and I said, when and he said about midnight and I said, where is he now and he said he is out on the Thunderhead Falls Road and I said, about where and he said, about two hundred yards from the bridge on the left side."

Boze called the sheriff's office on the phone and advised them of the circumstances and asked them if they would send a unit to check Thunderhead Falls Drive because it was outside the police department's jurisdiction. Boze then asked a secretary to come into his office where Graves was advised of his rights and further questioned. Defendant was placed in a cell of the city jail while it was typed, after which he was returned to the office; he then read it over and after making several changes signed it. He asked whether Stevens had been found and was advised he had been; he then asked if he was dead and was told he was. Defendant said he was not mistreated or abused nor did he claim anyone of the police department or sheriff's office ever mistreated or abused him.

■ After some conferences, the trial judge, out of the presence of the jury, heard evidence relative to the voluntariness of Exhibit 1, headed Statement of Jeremiah Graves, much of it being directed to the claimed inability of Graves to understand or waive his rights because of his claimed emotional state. Over objection the judge concluded to admit it and permit defendant's counsel to go into all the circumstances in front of

the jury. Upon resumption of the trial before the jury, the Statement was offered and received in evidence without objection. Defendant

> "makes no contention that his statements at the police station that he wanted to report a murder or that he had killed his landlord or as to where his landlord's body had been disposed of are in any way inadmissible. He does, however, urge that the statement he gave during his interrogation while in the custody of Detective Sergeant Boze"

was inadmissible under Miranda v. Arizona for the reason he was not properly advised of nor did he affirmatively waive his constitutional rights to have counsel, and he could not have intelligently waived his constitutional rights under the condition of mental stress when he went to the police station to turn himself in and "get it off my chest" as he testified.

Appellant's brief presents this issue sharply by stating:

> "While it is true that Detective Sergeant Boze did advise the Defendant of his constitutional rights and that when asked if he understood them, the Defendant replied that he did (State's Exhibit 1, page 1), nevertheless there was no showing that the Defendant, nor in fact the police officer, was aware of the fact that under the holding in Miranda, a Defendant, prior to being interrogated, must affirmatively waive his right to counsel."

We believe the trial court did not err in admitting the Statement. There was compliance with Miranda for Graves was sufficiently warned and advised at that time he could remain silent—that is, he did not have to answer if he did not wish to do so; he could consult an attorney, that one would be appointed by the court to represent him if he could not afford it and that anything said could be used against him in court and that he knowingly and affirmatively waived those rights. He was specifically asked if he understood this and answered yes, and also was asked, after being advised of these rights, if he was willing to answer the

questions. He said, "I will answer what I can." This was not silence but an affirmative indication of his decision. He was again asked if he understood that he could refuse to answer any of the questions and he answered yes. Those answers with knowledge of his rights showed a continuing willingness to tell his story. He was a high school graduate, a former member of the Air Police and shown to be a satisfactory employee in the stocking and marking goods section of the Air Force Commissary. All the evidence of the prosecution and defense was that defendant of his own free will went to the police station to give himself up and tell the officials what he had done. Both the oral statements he made and the oral statements thereafter reduced to writing were of his own volition and the purpose of his visit.

Further, the opinions of the United States Supreme Court in Miranda v. State of Arizona; Vignera v. State of New York; Westover v. United States; and State of California v. Stewart, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974, showed each defendant was in custody and had been deprived of his liberty during the time the confessions were obtained. Vignera had been "picked up" by the police and taken to one police headquarters and then transferred to another where he was questioned as to a robbery. It was not shown he was advised of his right to counsel before making an oral confession to a detective upon questioning at the police station or a similar transcribed confession made later. He was therefore in custody when he made the first oral statement and in custody under formal arrest when he gave the later statement. In the other three cases defendants had been arrested, were in custody of officers and restrained of their freedom in jails or in police stations at the time of their claimed confessions. That Miranda applies only to in-custody interrogation appears as a thread running through that opinion.

▮ Boze testified when he started questioning Graves he did not know what kind of person he was and he "did not know that a crime had been committed"; that persons have reported murders before and he did not know about this one and

his first thought was that Graves "was mistaken, that maybe he had gotten into a fight with his landlord", that some individuals "report things like that when it isn't true" and that he just checked it out. After Graves told him where he had taken Stevens he knew he was either telling the truth or making up a pretty good story. Prior to that "I thought maybe he was just mistaken." At that time defendant was not under arrest, in custody, or deprived of his liberty and no complaint had been made or warrant of arrest issued. It was a situation where a person of his own volition was telling his story to an officer to get it off his chest. "I just wanted to tell them everything that happened". It was not until after he had done so the Sheriff's office verified finding Stevens' body; Boze did not then know the cause of death. Later when it appeared Stevens' death was caused by unlawful means a complaint was made and a warrant issued. The questioning was a continuation and explanation of defendant's report of not only an unsolved crime but one unreported and unknown to anyone but Graves and was an extension of the statements first made. We believe the court in Miranda does not prevent a penitent to admit his errors, even to a police officer, nor bar admission of this evidence under the facts here present.* This conclusion seems to be foreshadowed by the Supreme Court in Miranda when it wrote:

> "There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U.S. 478, 86 S.Ct. 1630, 16 L.Ed.2d 726, 10 A.L.R.3d 1014, note 47.

---

* The line between investigatory and accusatory stages of a criminal proceeding is not easily determined. Where there is no knowledge of a crime having been committed some questioning of a person not under arrest or restrained of his liberty is permitted. While the facts vary, the following opinions indicate some latitude under the circumstances: State v. Zachmeier, Mont.1968, 441 P.2d 737; State v. Bower, Wash.1968, 440 P.2d 167, statement made in police car while being taken to police station—defendant not in custody; State v. Billings, Nev.1968, 436 P.2d 212, voluntary statements after being locked in cell; Tolley v. Page, 1968, Okl.Cr.App., 436 P.2d 242, defendant voluntarily appeared at police station where he gave a statement prior to being placed in custody; State v. Abbott, 1968, 21 Utah 2d 307, 445 P.2d 142, defendant convict asked about ownership of knife used to kill another.

 Defendant contends the trial court erred in submitting the issue of insanity to the jury. From a consideration of the testimony of the pathologist of the cause and time of death, the opinions of three psychiatrists as to the ability of defendant to know right from wrong during the time involved, the testimony of defendant and all the other evidence relevant to his accountability for the homicide, we conclude there was sufficient evidence for the trial court's denial of a directed verdict for defendant. It was a question for the jury to give such weight to the experts' opinions as the foundations for those opinions and other facts justified. A recital of that evidence would necessarily be extended and not determine any matter of law or guidance for future trials. Generally the testimony of such experts is not conclusive on the jury; it was entitled to place whatever weight it chose upon such evidence as the opinions were dependent on the facts supporting that testimony. The jury could consider it with all the other testimony and evidence. 31 Am.Jur.2d, Expert and Opinion Evidence, § 185. See also 30 Am.Jur.2d, Evidence, §§ 1161, 1177.

 Defendant complains of the refusal of the court to give several proposed, and of the giving of other, instructions. While in different wording it appears the court gave instructions covering the subjects in the proposed instructions and thus there was no error in this regard. The objection to Instruction 8 was to the use of a phrase therein; this was defined in Instruction 9 and as no exception was taken to that Instruction no error can be predicated thereon.

Strenuous argument is made that Instruction 15 is an incorrect statement of requirements of proof of insanity in that it failed to advise the jury "the burden was on the State to prove that the Defendant was sane at the time of the alleged crime beyond a reasonable doubt." Defendant contends the court's instruction is almost identical with that given by the trial court and disapproved by this court in State v. Waugh, 80 S.D. 503, 127 N.W.2d 429. In Waugh the instruction was:

" 'to establish insanity as a defense, positive or direct testimony is not required, nor is it necessary to establish

this defense beyond a reasonable doubt. It is sufficient if the jury is reasonably satisfied by the weight or preponderance of the testimony that the accused * * * was * * * incapable of distinguishing between right and wrong.' "

This court held, when insanity is put in issue, it becomes the burden of the State to prove beyond a reasonable doubt that defendant is sane enough to be held criminally responsible. Instead the Waugh instruction erroneously placed the burden on defendant of proving insanity as a defense, and this by the weight or preponderance of the evidence. The court therefore reversed, though there were some statements in the instruction mentioned and the one following it which correctly stated the law and were inconsistent with the challenged instruction. If the instruction was prejudicially erroneous or inconsistent with other instructions as in Waugh the court would be required to reverse, but we do not believe the trial court's Instruction 15 contains the Waugh error.

■ In our opinion the instructions on this issue and others generally were consistent and not erroneous and for clarity mention them chronologically. By Instruction 3 the court advised the jury of the presumption of innocence of defendant and in case of reasonable doubt of his guilt he was entitled to be acquitted; Instruction 4 placed the burden, at all times upon the State, to prove every material fact and element of the offense beyond a reasonable doubt and by No. 5 defined that term. Instruction 7 defined the offense charged and included offenses and required proof for each beyond a reasonable doubt. Instruction 15 after defining the persons capable and incapable of committing crimes, the presumption of sanity, its disappearance when any evidence of insanity is produced and the duty of the jury if it had a reasonable doubt thereon then, as to the burden of proof, the court continued (defendant objects to and criticizes the first paragraph):

"The defendant does not have to prove this issue by a preponderance of the evidence or beyond a reasonable doubt, nor does he have to produce any evi-

dence on this issue. Proof on this issue is sufficient when, irrespective of its source, some evidence is produced in the case which tends to show insanity or unsoundness of mind of the degree prescribed at the time of the act charged, which evidence raises in your minds a reasonable doubt on this issue.

"Temporary insanity, as a defense to a crime, is as fully recognized under this law as is insanity of long duration. The test is as previously stated and applies to the time when the act charged was committed. If you have a reasonable doubt, based upon the evidence touching the question of insanity, that the defendant was sane at such time, you must find him not guilty by reason of insanity even if he was sane at earlier or later times or at any earlier or later period."

It will be seen the instruction does not require defendant to prove insanity by the "weight or preponderance of the testimony" as in Waugh, but advised the jurors defendant bore no such burden and the evidence was sufficient if, irrespective of any source, it raised a reasonable doubt on the issue. There was no question of defendant's sanity generally, the only evidence was on his claim of temporary insanity, and as to that the court set out the same guidelines and advised the jury if it had a reasonable doubt that defendant was sane when the act was committed it must find defendant not guilty by reason of insanity.

■ Objection is made to the inclusion of Instruction 16, where the court discussed the doctrine of irresistible impulse, on the ground there was no evidence on this subject. We are inclined to agree with the trial judge's remark to counsel that the conduct of the defendant "as closely resembles what we call an irresistible impulse as it does anything else", that the jury had a right to consider his actions in that light and giving the instruction was not error.

The admissibility in evidence of testimony of F.B.I. agents and local officers relating to blood tests, hair and tire prints and

other claims of error have been given attention and do not require a reversal. The judgment, therefore, is affirmed.

All the Judges concur.