## FRED ANDERSON *v.* STATE OF MARYLAND

[No. 289, September Term, 1968.]

*Decided May 5, 1969.*

*Sidney S. Campen, Jr.,* for appellant.

*Henry J. Frankel, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *John C. North, III, State's Attorney for Talbot County,* on the brief, for appellee.

MURPHY, C.J., delivered the opinion of the Court.

Appellant was found guilty by a jury in the Circuit Court for Talbot County of manslaughter and was thereafter sentenced by the court to a term of ten years under the jurisdiction of the Department of Correction. He contends on this appeal that the lower court erred in overruling his pretrial motion to suppress his confession and in thereafter permitting the confession to be received in evidence at the trial. More specifically, he urges that his written statement was inadmissible in evidence because the State failed to prove that he had voluntarily, knowingly, and intelligently waived his constitutional right to remain silent and to have counsel to represent him.

There was evidence adduced at the trial from which the trier of fact could find that T. J. Cooper, a migrant farm worker, was stabbed while in the living quarters provided him by the Adams Cannery, and that shortly thereafter he died of his

wounds; that State Trooper Charles M. Griffith arrived at the cannery at approximately 4:00 a.m., where he found appellant in a nearby shanty "very drunk" and arrested him; that he searched appellant, removed a knife from his pocket and transported him to the State Police Barracks where he was placed in a cell; and that there was no conversation with him until the early afternoon when he awoke, ate a meal, and made a written statement to Sergeant Emil C. Myers that he had stabbed Cooper because Cooper had been "picking on me."

At the hearing on appellant's pretrial motion to suppress his confession, appellant testified that he was 62 years old, had not advanced beyond the fourth grade in formal education, and at the time of the crime had been employed by the Adams Cannery as a migrant farm worker. He admitted drinking two pints of wine on the night Cooper was killed and that he had not been questioned until after he awoke later that day in a cell. He stated that when Sergeant Myers took him from his cell and began questioning him, he was "feeling pretty nervous at the time," and that the conversation began with Sergeant Myers informing him that Cooper had died and that he should "tell him what happened." His attorney then asked him:

> "Q. Did he say anything to you before he asked you to tell him what happened?
> A. No sir.
> Q. Are you sure he didn't say anything to you?
> A. No sir.
> Q. Fred, did he mention something about a lawyer?
> A. Well, he mentioned that after he—shortly after he asked me about the—to tell him what happened.
> Q. Fred, are you sure he asked you before or afterwards? Didn't he mention something to you about a lawyer, and what not?
> A. He did mention something about a lawyer. . .
> Q. And asked you some questions?
> A. Yes sir.
> Q. Do you remember anything else that he asked you Fred?
> A. (No answer)

\* \* \*

Q. Fred, if the officer told you something about a lawyer, that you had a right to a lawyer why didn't you ask him for a lawyer?

A. Well, I thought anytime would do, I didn't know.

Q. I didn't hear your answer. What's that?

A. I thought it would be anytime—anytime I could see a lawyer, I thought it would be all right. I didn't know.

Q. Did he tell you at that time that you had a right to an attorney, or a lawyer, and that you had a right not to answer anything before you had a lawyer?

A. Well, yes sir.

Q. Did you understand that?

A. No sir, I didn't understand it.

Q. Did the officer tell you that you had a right not to say anything at that time?

A. That I had a right not to say anything? I don't remember."

Then, on cross-examination, appellant was further questioned:

"Q. And after he told you that then he told you you had a right to a lawyer, isn't that right?

A. Yes sir.

Q. And did you ask him for a lawyer?

A. No sir.

Q. He told you, did he not, that if you wanted a lawyer but couldn't afford one that the State would furnish one at no cost to you?

A. Yes sir.

Q. But you still didn't ask for one? At that time?

A. No sir.

Q. Now he also told you you had a right to remain silent and not answer any questions, didn't he?

A. He might have.

Q. He might have but you don't remember that. . .

A. No sir.

Q. . . .too clearly. Now, he also told you that anything that you said would be used against you, or

could be used against you in a trial later on, didn't
he?

A. Yes sir.

Q. And he also said that if after you started answer-
ing questions you wanted a lawyer that you could
have one at any time, didn't he?

A. I don't know sir, he might have, but I don't re-
member it.

Q. You don't deny that he said that? You just don't
remember is that correct?

A. No sir, I don't remember.

\* \* \*

Q. Do you recall Sgt. Myers asking you whether you
understood the rights that he'd explained to you?

A. No sir.

Q. You don't remember that?

A. No sir.

Q. Do you deny that he asked you that?

A. I wouldn't say that he didn't ask me that, I don't
remember.

\* \* \*

Q. But he told you you had a right to remain silent
and that anything you said could be used against
you. Didn't he tell you that?

A. Yes sir.

Q. Well, didn't you understand that to mean that you
had a right to remain silent, not to answer any-
thing just as he had told you?

A. No sir, I didn't know what that mean.

Q. I see. Now he also told you that you had a right
to a lawyer. Did you know what that meant?

A. A right to a lawyer?

Q. Yes.

A. Yes sir.

Q. And you understood, did you not, that a lawyer
would be furnished you at no expense if you wanted
one?

A. Yes sir.

Q. And you also understood, did not you, that you had the right to stop answering questions at any time that the Sergeant was asking questions of you?

A. No sir, I didn't know that.

Q. You didn't know that. Did you at any time ask for a lawyer?

A. No sir.

\* \* \*

Q. Did you object to signing the statement?

A. Well, I had to do—I thought I had to do what he asked me to do. He told me to sign it.

Q. Do you remember the Sergeant reading the statement back to you before you signed it?

A. Yes sir.

Q. Was what he read back to you correct and accurate?

A. I guess so.

\* \* \*

Q. If the statement as read back to you by Sergeant Myers was not correct in some part of it, if he put down something that you didn't say would you have spoken up and called that to his attention?

A. If I could've remembered it.

\* \* \*

Q. \* \* \* The question was asked you, 'Do you understand', and you answered 'Yes sir, I do', and now you say that you didn't understand. Now my question is why would you first say at that time that you did understand, if in fact you didn't?

A. Well, I don't know what silent means.

Q. You don't know what silent means?

A. No sir.

Q. Well, did you ask Sgt. Myers what silent means?

A. No sir.

Q. When he asked you if you understood you said 'Yes', didn't you?

A. Yes sir."

At the conclusion of appellant's testimony, the defense produced as a witness Dr. William Bosma, a psychiatrist at Clif-

ton T. Perkins Hospital, who, on three occasions immediately prior to trial, had examined appellant. He testified that appellant's intelligence was in the "dull, average" strata, and that while his vocabulary was "very poor" in connection with anything but his work, he was "extremely good with numbers"; that he categorized appellant as a "passive character," one who would not oppose the expressed intentions of other persons, and that this personality trait was such that appellant would answer questions asked of him in the affirmative regardless of whether he truly agreed with the responses; that appellant "would say no if the statement was untrue but I think if certain pressure were applied, which I understand had not been, he would say yes"; and that when he (Dr. Bosma) read the four-fold constitutional warnings printed at the beginning of the statement form to the appellant, the appellant did not understand the words "absolute," "silent," "statement" and "to be questioned." It was Dr. Bosma's opinion that the appellant did not comprehend the meaning of his constitutional warnings.

The State then called Sergeant Myers as a witness, who stated that prior to questioning appellant concerning the crime, he informed him of the rights required by *Miranda v. Arizona,* 384 U. S. 436, and was convinced that he understood them and desired that they be waived. The following colloquy occurred:

> "A. I was doing it off the cuff but at the same time referring to the form because many times it would say 'we', and of course I was alone, I would have to say 'I', and for that reason I was more or less talking to him, but at the same time referring to these notes to make certain that I got each of them in.
>
> Q. All right sir. Go on.
>
> A. I told him that if he did want to make a statement and did answer our questions, anything he did say would be used against him in a court of law. He also had a right to be alone with a lawyer and to talk to him and be advised by him before being questioned. After he talked to a lawyer he could also have him present during any time

during the taking of the statement, or any time that we talked with him. He was told if he was unable to afford a lawyer but he did want one before talking to us that a lawyer would be appointed to represent him at public expense, without cost to him. If he did decide to talk to me without a lawyer present, but during the questioning he wanted to stop and have a lawyer he had a right to do so and to say nothing more. He was told that he was not being promised anything to make a statement or to answer questions, and that no threats are or would be made against him to have him tell us anything. He was then asked if he understood what I just told him.

Q. Well what were the words that you used?

A. I asked him if he understood what I just told him.

Q. And what was his reply?

A. Yes sir.

Q. Did he ask any questions of you at this stage?

A. No sir.

Q. Did he request an attorney?

A. No sir.

Q. Did he say that he didn't want to answer any further questions?

A. No sir.

Q. Did he indicate to you that he wished to exercise his right to remain silent?

A. No sir.

Q. Did you have any reason to feel one way or another whether—as to whether he had or had not understood you?

A. I've always felt that he understood me.

\* \* \*

Q. What, if anything, was said by Anderson to cause you to have any question as to whether or not he'd understood what you'd said?

A. Before asking any questions concerning the actual

death or the actual incident surrounding the death of Cooper he was asked several other preliminary questions. For instance, 'are you willing to make a voluntary statement after being advised your rights?' 'Do you understand that by making this statement that you are waiving the right you have not to talk to us, and to have a lawyer present?' 'Can you read and write?' 'How far did you go in school?' 'State your name, age and address.' All those questions were asked prior to the question concerning the actual incident. I realized that his intelligence was not even average in my judgment and so I carefully talked with him during the taking of the statement to be sure that he did understand me.

Q. What caused you to conclude that his intelligence was not average?

A. His demeanor, the way he spoke coupled with the responses. He only went to the Fifth grade in school. He was very quiet, very cooperative.

Q. Well, what if any, special efforts did you make to try to communicate to him? To explain to him what his rights were.

A. Only by talking slowly, carefully with him, and trying not to give him the impression I was reading something rapidly. I talked with him on each question. . . ."

Upon conclusion of Sergeant Myer's testimony, the court denied appellant's pretrial motion to suppress his confession, stating its reasons as follows:

"I feel that under the circumstances of this case that the Sergeant did everything that any person could reasonably do dealing with this Defendant to explain to him what his rights are, and the fact that he goes along and tells the police what happened—until such time as the Courts take the position which they well may take, that statements just may not be used—but

until that time, until they're outlawed, it seems to me that under the Miranda ruling, and even with what the Court of Special Appeals has said, thus far, that in this case that this Defendant understood the situation and said he understood it, obviously he's going to say today he didn't understand it, * * *. I think in this case the officer was fair, considering this man's relatively high level of intelligence. I've viewed people coming before the Court many of them in the 60's or 70's [I.Q.]. This man's in the 80's. Admittedly he can say he did not understand what the word statement means, or absolute, or what being questioned means, but he certainly must have understood that he could remain—he didn't have to answer questions. The term 'remaining silent', he makes a point that he didn't understand what silence is, but when he's told he could answer questions or not answer questions, and he could stop anytime the questions were taking place, and ask for a lawyer, he had a right to have a lawyer present during all the questioning, that sort of thing I can't help but believe from his own demonstration of understanding normal simple English that he understood what was going on, that he wanted to tell them, and if he wanted to tell them why he ought to have a right to tell them * * *."

Subsequently, at the trial Sergeant Myers testified before the jury that appellant was first questioned with no other persons present, in the Investigator's office at 12:10 p.m. after he had been fed; that he identified himself and informed appellant that Cooper had died and that before asking him any questions he wanted to inform him of his rights; that he advised him of his four-fold *Miranda* warnings "talk[ing] to him very slowly and carefully," and "at the same time referring to the form to make sure that I covered each and every one"; that appellant responded that he understood the warnings, asked no questions and at no time requested an attorney or refused to be questioned; that he answered questions with a yes or no and if required to make an explanation in response to a question, "he

did make that explanation"; and that he read the completed statement to appellant who signed it without question. Appellant's testimony was repetitious of that which he gave at the hearing on the motion to suppress and Dr. Bosma's earlier testimony was stipulated into evidence.

The written confession was admitted in evidence over counsel's objection that appellant had not made "a knowing, intelligent, voluntary waiver of his constitutional safeguards prior to making this statement and therefore the statement is inadmissible as evidence." Photographs taken of the scene of the crime and the knife recovered from appellant's person at the time of his arrest were also admitted in evidence. Appellant then testified as to the circumstances of the crime, that Cooper had taunted him and that he stabbed Cooper when he thought that Cooper was going to hit him with a pipe.

We think it clear from the evidence that the appellant was apprised of the complete panoply of warnings required under *Miranda v. Arizona, supra,* prior to his custodial interrogation. Appellant maintains that his mere statement that he understood the import and significance of those rights does not constitute an effective waiver thereof because in view of his limited intellect he was unable to intelligently comprehend the meaning of the rights which he allegedly waived.

*Miranda* makes clear at page 475 that if after the constitutional warnings required by that case have been given, custodial interrogation is undertaken without the presence of an attorney and a statement is taken, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel"; and that no evidence obtained as a result of a custodial interrogation can be used against an accused unless and until the prosecution demonstrates a waiver of his constitutional rights within the meaning of *Johnson v. Zerbst,* 304 U. S. 458, a case which holds that waiver of a fundamental constitutional right is ordinarily "an intentional relinquishment or abandonment of a known right or privilege," the determination of which "must depend in each case, upon the particular facts and circumstances surrounding

that case, including the background, experience, and conduct of the accused." A valid waiver, however, "will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained," *Miranda* at page 475; and in no event can the failure of the accused to ask for a lawyer constitute a waiver, *Miranda* at page 470. But, as pointed out in *United States v. Hayes,* 385 F. 2d 375 (4th Cir.), an express statement by an accused undergoing custodial interrogation that he understood his *Miranda* rights and nevertheless wanted to make a statement is not an essential link in the chain of proof of waiver. And the proper inquiry is not whether the accused made an intelligent decision in the sense that it was wise or smart to admit his participation in the crime, but whether his decision was made with the full understanding that he need say nothing at all and that he might then consult with a lawyer if he so desired. *United States v. Hall,* 396 F. 2d 841 (4th Cir.). In *People v. Johnson,* 450 P. 2d 865, the Supreme Court of California held that "Once the defendant has been informed of his rights, and indicates that he understands those rights, it would seem that his choosing to speak and not requesting a lawyer is sufficient evidence that he knows of his rights and chooses not to exercise them." In *Brown v. State,* 3 Md. App. 313, we held that despite the fact that the evidence does not show an express waiver of the accused's right to remain silent and to consult with and/or have counsel present during the interrogation, nevertheless a valid constitutional waiver within the meaning of *Johnson v. Zerbst, supra,* can be found where the totality of the circumstances— the attendant facts of the case—implicitly show that the accused voluntarily and intelligently relinquished his *Miranda* rights and made a statement. Thus, in *Miller v. State,* 251 Md. 362, the defendant, having been afforded his full *Miranda* warnings, was asked prior to interrogation whether, in view of these warnings, he wanted to make a statement and he replied in the affirmative. The court there found that the accused had waived his *Miranda* rights after careful and deliberate consideration, citing as attendant circumstances the fact that there was no allegation of mistreatment, the accused said he understood the warnings, and the interrogation was undertaken at the accused's own

request. In *Mullaney v. State,* 5 Md. App. 248, the accused was given full *Miranda* warnings and asked whether "having these rights in mind" he wanted to talk to the police, in response to which the accused "nodded his head in a yes position." While the accused did not immediately make a statement, he did so a short time thereafter, and we found an implied waiver of his *Miranda* rights, observing by way of attendant circumstances that the accused indicated understanding of his *Miranda* rights, was twenty years old and a high school graduate, there was no evidence of mistreatment or of impaired intellectual endowments, and the accused had been caught red-handed in the act of committing the crime. See also *Delone Brown v. State,* 6 Md. App. 564; *Minor v. State,* 6 Md. App. 82.

In *State v. Kremens,* 245 A. 2d 313, the Supreme Court of New Jersey, discussing the requirement of the waiver of *Miranda* rights, held it absurd to believe that that case requires a formal recitation by an individual that "I do not wish to exercise my right to remain silent; I do not wish to exercise my right to an attorney." The court there said: (page 317)

> "* * * Any clear manifestation of a desire to waive is sufficient. The test is the showing of a knowing intent, not the utterance of a shibboleth. The criterion is not solely the language employed but a combination of that articulation and the surrounding facts and circumstances."

Cases tending to this view are now legion. In addition to *Hayes, Johnson,* and the Maryland cases, see *Keegan v. United States,* 385 F. 2d 260 (9th Cir.); *Gonzales v. State,* 429 S.W.2d 882 (Tex.); *State v. McKnight,* 243 A. 2d 240 (N. J.); *State v. Wright,* 444 P. 2d 912 (Ore.); *State v. Matt,* 444 P. 2d 914 (Ore.); *Brisbon v. State,* 201 So. 2d 832 (Fla.); *State v. Auger,* 434 S.W.2d 1 (Mo.); *State v. Graves,* 163 N.W.2d 542 (S. D.); *State v. Godfrey,* 155 N.W.2d 438 (Neb.); *State v. Hyde,* 158 N.W.2d 134 (Iowa); *Breedlove v. State,* 204 So. 2d 836 (Ala.). Compare *Sullins v. United States,* 389 F. 2d 985 (10th Cir.), and *People v. Anonymous,* 294 N.Y.S. 2d 248 (N. Y.).

In the present case, appellant admitted in effect that he understood that he had a right to have a lawyer but that he didn't ask for one because he thought "any time would do." And while he also admitted that he was told he had a right to remain silent, he stated that he did not know what that meant, although he admitted telling Sergeant Myers that he said he understood his *Miranda* warnings.

Sergeant Myers testified that from appellant's demeanor and responses to his questions, he realized that he was not of average intelligence. The record reveals a patient and painstaking effort on the part of Sergeant Myers to outline in a clear conversational tone the four-fold *Miranda* warnings, and also reveals that before questioning the appellant he asked him certain questions, including "[A]re you willing to make a voluntary statement after being advised of your rights?" and "Do you understand that by making this statement that you are waiving the right you have not to talk to us, and to have a lawyer present?" Unfortunately, the testimony does not reveal what, if any, response appellant made to these specific questions. We think at the minimum, however, that there was evidence that appellant said he understood his rights and was afforded an opportunity to exercise them. Appellant was sixty-two years of age and had an I.Q. of 83-87, and while Dr. Bosma testified that appellant did not understand the warnings, the trial judge, having had the benefit of seeing and hearing the witnesses, particularly including the appellant, and observing their demeanor, concluded that appellant did in fact understand the warnings; that he was not of such low intelligence that he didn't understand what was told to him by Sergeant Myers in "normal simple English" and that, in making the statement, he fully understood his rights. There was no allegation of mistreatment by the police and no lengthy interrogation, the confession being given soon after interrogation was initiated. Under these circumstances, we cannot say that the trial court erred in rejecting Dr. Bosma's testimony and concluding that appellant knowingly and intelligently waived his *Miranda* rights. See Maryland Rule 1086. And while we have not considered appellant's express waiver of his constitutional rights contained in his written statement as substantive evidence of waiver (the statement was

not introduced into evidence until after the issue had been decided by the trial judge), it does tend to show in explicit terms the existence of the waiver that we have found implicit on the facts and circumstances of this case.[1] See *Brown v. State, supra,* at page 323.

*Judgment affirmed.*

---

1. In his written statement, which appellant signed and initialed in numerous places, he stated affirmatively that he understood his *Miranda* rights; that he was nevertheless willing to make a voluntary statement and that in doing so, he knew he was waiving his right not to talk to the police and to have a lawyer present.