**STATE of South Dakota, Respondent,**

v.

**Felix ROMERO, Appellant.**

**No. 12275.**

Supreme Court of South Dakota.

Sept. 7, 1978.

Peter H. Lieberman, Asst. Atty. Gen., Pierre, for respondent; William J. Janklow, Atty. Gen., Pierre, on the brief.

Neil Carsrud, Belle Fourche, for appellant.

WOLLMAN, Justice.

Defendant was charged with first degree burglary and assault with a dangerous weapon. Defendant entered pleas of not guilty and not guilty by reason of mental illness. Following a trial to the court, defendant was found guilty of first degree burglary and of assault and battery. We affirm.

Defendant's sole contention on appeal is that the evidence was insufficient to support the trial court's finding that at the time appellant committed the offenses he was not mentally ill nor so intoxicated as to be incapable of forming the specific intent to commit the offenses of which he was found guilty.

Viewing the evidence in a light most favorable to the verdict, *State v. Geelan*, 80 S.D. 135, 120 N.W.2d 533; *State v. Henry*, 87 S.D. 454, 210 N.W.2d 169, we find that the state's evidence established that at approximately 1:00 a. m., December 17, 1976, the victim of the offenses, a nineteen year old woman, was awakened while she lay asleep in her Belle Fourche apartment by the sound of footsteps coming up the stairs and a subsequent loud clunking noise at the door to her living room. She walked to her living room and observed an intruder standing in the room in front of the door, which he had apparently closed behind him. Upon receiving no response to her inquiry concerning the intruder's identity and purpose, the victim began screaming. She ran to the door and unlocked it, whereupon the intruder grabbed her by the arm and began saying over and over, "Your bedroom, your bedroom." He then produced a pocket knife, opened the blade with his thumb, brought the knife towards the victim in a sideways motion and cut her on the side at a point approximately eight inches above her hip. (The cut was so superficial that the victim was not aware at the time that she had been wounded.) The victim backed away into the corner of the room, and as she cowered there in a squatting position defendant began choking her by pinching her throat between his thumb and forefinger tightly enough to cut off her air, all the while repeating, "Your bedroom, your bedroom." The victim starting pleading with the intruder not to hurt her, whereupon he released his grip and let her stand up. The victim again started screaming and began pounding on the floor in the hope that she would awaken her downstairs neighbors. The intruder grabbed the victim and again began choking her. She pled with him not to hurt her, whereupon the intruder released his grip, enabling the victim to run from the apartment and summon help. After the police arrived, the victim began driving around town with her parents. She saw a pickup truck driving slowly past her house and observed that the passenger therein appeared to resemble the individual who had been in her apartment a few minutes earlier. The victim and her parents followed the pickup truck to a local cafe, where shortly thereafter she identified the defendant as the person who had broken into her apartment earlier that morning. The victim had seen defendant a number of times prior to this occasion as she walked by his house to use the telephone. The victim

testified that defendant's breath "smelled like he was very, very drunk," that defendant was unsteady on his feet, and that his speech was slurred.

The officer who was present at the time the victim identified defendant in the cafe testified that although it appeared that defendant had had something to drink, defendant appeared to have no trouble understanding the officer upon being taken to the sheriff's office.

Defendant testified that he began drinking beer in various bars in Belle Fourche early during the evening preceding the events giving rise to this prosecution. After depleting his own supply of money, defendant borrowed forty dollars from his employer and resumed his journey from bar to bar. At closing time, defendant rode around town as a passenger in a pickup truck driven by a companion whom defendant had met at some point late in the evening. Defendant testified that he remembered "parking down by my house and I was supposed to go and ask somebody for a date. I remember walking up to the door and knocking on it." Defendant testified that the next thing he remembered was being at the cafe with his new-found companion and being arrested shortly thereafter. He denied any recollection of the events that occurred between the time that he knocked on the door and the time that he found himself at the cafe. Defendant acknowledged that he had seen the victim walk by his house on earlier occasions and that he could recognize her by sight. Defendant testified that he drinks almost every day, that he frequently becomes intoxicated, and that he considers himself an alcoholic.

Testifying in defendant's behalf, Dr. Donald W. Burnap, a psychiatrist, stated that he believed that defendant had no significant psychiatric illness, with the exception of chronic alcoholism. In response to a hypothetical question based upon the events of the night in question, Dr. Burnap testified that it with his opinion that defendant was experiencing an acute organic brain syndrome, secondary to alcohol, at the time

he was alleged to have committed the offenses charged. He further testified that it was his opinion that because of defendant's intoxication at the time, defendant would not have been able to appropriately distinguish right from wrong, nor would he have been able to form the specific intent to commit the offenses charged. In response to a question during cross-examination regarding defendant's capacity for violence, Dr. Burnap testified that it was his subjective feeling that defendant would not harm someone else and that he would trust defendant alone with his (Dr. Burnap's) family.

In rebuttal, the state offered the testimony of Dr. Costas Hercules, a psychiatrist, who testified that he found no evidence of any psychiatric impairment in defendant. His diagnosis was that defendant was suffering from chronic, excessive alcoholism. During his interview with Dr. Hercules, defendant stated that he could not remember anything about the alleged incident. Accordingly, when asked by the state whether he could make any diagnosis concerning defendant's capacity for knowing the difference between right or wrong or for forming the specific intent at the time of the alleged offenses, Dr. Hercules testified:

I reviewed the information that he provided, and I could form some vague opinion based on that, but I think that kind of decision could be best made by people for [sic] direct testimony and direct evidence about what actually transpired. How he behaved at the time, did there seem to be a logical progression to what he was doing, what kind of interaction took place between him and other people involved. . . . I think that [whether defendant knew right from wrong at the time] could best be gauged by what actually happened then.

In response to defense counsel's hypothetical question based upon the facts established by the testimony, Dr. Hercules replied that he could not form an opinion based upon a reasonable medical certainty on the question whether defendant was capable of forming the specific intent re-

quired of those offenses at the time he was in the victim's apartment. Dr. Hercules did agree that it appeared that defendant was suffering from an acute organic brain syndrome, secondary to alcohol, at the time of the events in question.

In rebuttal of Dr. Burnap's opinion that defendant was not given to violence, the state introduced testimony from the woman with whom defendant had been living for more than a year that on April 27, 1977, at a time when she was some nine months pregnant, defendant had struck her in the abdomen, this at a time when he was sober. This witness testified that defendant had struck her on many other occasions when he was drinking.

■ Defendant contends that because Dr. Hercules was not willing to express an opinion to the effect that defendant knew right from wrong at the time of the alleged offenses and that he could form the specific intent required to commit the offenses in question, the state's evidence was insufficient as a matter of law to support the trial court's finding of guilt. We do not agree.

The trial court weighed the evidence in the light of certain South Dakota Pattern Jury Instructions submitted by defense counsel regarding the weight to be given to the testimony of medical experts and regarding voluntary intoxication as a defense. The trial court considered the evidence for a full week before announcing its findings from the bench. It is apparent from a reading of the transcript of these proceedings that the trial court very carefully considered the matters of defendant's alleged mental illness and his alleged incapacity to form the specific intent required by law. The trial court carefully considered Dr. Burnap's testimony and found it wanting when weighed against the factual background of the case. In the trial court's words, "Acts speak louder than words." The oral decision and findings of the trial court were reduced to written findings of fact, conclusions of law, and verdict.

■ We conclude that the evidence amply supports the trial court's finding of guilt and that the trial court acted well within its power as the finder of fact when it rejected Dr. Burnap's testimony and concluded on the basis of all of the facts and circumstances that defendant was indeed capable of determining right from wrong at the time in question and that he possessed the capacity to form the specific intent to commit the crimes of which he was found guilty. As we said in State v. Kindvall, 86 S.D. 91, 96, 191 N.W.2d 289, 292:

In addition to the opinion evidence of experts and laymen, a defendant's mental condition may be proved by circumstantial evidence. Mental Disorders as a Criminal Defense—Weihofen, p. 312. The acts, conduct and declarations of the defendant, both prior and subsequent to the act charged, as well as at the time of its commission, are admissible to show his mental condition at the time of the act.

Although Dr. Hercules preferred to defer to the trial court's determination on the question of defendant's mental status and his capacity to form the requisite intent to commit the offenses, he did testify that he found no evidence of any psychiatric impairment other than chronic, excessive alcoholism. If anything, then, the state's evidence in the instant case on the question of defendant's mental condition was stronger than it was in the Kindvall case, supra, inasmuch as there the state's psychiatrist, in addition to being unable to give an opinion that the defendant knew right from wrong at the time of the crime, had diagnosed the defendant as a schizophrenic, paranoid type.

■ The fact that Dr. Burnap's testimony was not directly contradicted by Dr. Hercules did not preclude a finding that defendant was not mentally ill and that he did not lack the capacity to form the requisite specific intent. When taken together, Dr. Hercules' testimony that defendant suffered from no psychiatric impairment and the testimony concerning defendant's actions on the night in question formed a sufficient basis from which the trier of fact could properly resolve the conflicting evidence against defendant on both issues.

We conclude that what we recently said in *State v. Bush*, S.D., 260 N.W.2d 226, is applicable here:

It is obvious that there is a clear conflict in the evidence concerning defendant's intoxication and mental state at the time of the act. While the testimony relative to defendant's intoxication, other than defendant's own version, has not been here discussed in detail, it is sufficient to note that there was some evidence for and against the issue of intoxication, but again, that was an issue to be resolved by the jury from all of the evidence and circumstances in the case.

The rule requiring the prosecution to prove sanity beyond a reasonable doubt where mental illness is an issue, has been held to impose no general prohibition against conviction on conflicting evidence respecting sanity. 17 A.L.R.3d 177.

In other words, the mere fact that there was conflicting evidence on the issue of mental illness in this case, does not militate against a finding by the jury that sanity of the defendant has been established beyond a reasonable doubt. 260 N.W.2d at 231.

Likewise applicable is our even more recent holding in *State v. Provost*, S.D., 266 N.W.2d 96:

Even though Dr. Stephenson testified he did not feel that the defendant would have had the requisite specific intent because of his excessive intoxication, reading of the record indicates that the jury could have drawn an inference from the evidence that the defendant was capable of forming such an intent. This court must view the evidence in a light most favorable to the verdict. *State v. Henry*, 87 S.D. 454, 210 N.W.2d 169 (1973); *State v. Geelan*, 80 S.D. 135, 120 N.W.2d 533 (1963). The jury was properly instructed through instructions # 8 and # 9 on the specific intent required by the crime of grand larceny and also by instruction # 17 which indicated the possible effect intoxication would have on the specific intent element. We, therefore, cannot upset their findings. 266 N.W.2d at 100.

The trial court found incomprehensible defendant's claim that he could remember in detail all of the activities of the afternoon and night preceding the events in question and yet not be able to remember anything that occurred during the relatively short period of time that he spent in the victim's apartment. The trial court viewed defendant's decision to flee when the victim screamed as an indication that defendant knew that what he was doing at the time was wrong and that he was in dire trouble as a result of his acts. What we said in the *Bush* and *Provost* cases, supra, and in *State v. Graves*, 83 S.D. 600, 163 N.W.2d 542, regarding the prerogative of the jury to accept or reject the opinions of experts applies with equal force to the trial court in the instant case. See *State v. Means*, S.D., 268 N.W.2d 802. Accordingly, we cannot say that the evidence was insufficient to support the trial court's finding of guilt.

The judgment of conviction is affirmed.

All the Justices concur.